WILLIAM LEWIS, T/A CROSSON AND LEWIS ENTER-
PRISES, PLAINTIFF, v. TRAVELERS INSURANCE COM-
PANY, A CORPORATION, DEFENDANT-RESPONDENT,
AND JOHN CURRAN AND JAMES SYKES, T/A CURRAN
AND SYKES, DEFENDANTS-APPELLANTS.

Argued January 8, 1968—Decided March 4, 1968.

*Mr. Issac C. Ginsburg* argued the cause for appellants (*Messrs. Feinberg, Fishman and Ginsburg,* attorneys).

*Mr. Leonard C. Horn* argued the cause for respondent (*Messrs. Lloyd, Megargee, Steedle, Weinstein and Horn,* attorneys).

The opinion of the court was delivered by
.  WEINTRAUB, C. J. Plaintiff Lewis suffered a loss by fire early on September 5, 1963.  Defendants Curran and Sykes (herein agents) as agents for defendant Travelers Insurance

Company (herein Travelers) admittedly gave Lewis an oral binder on August 27, effective at once. Travelers, however, denied the agents' authority to bind it and contended it rejected the application by letter to the agents dated September 4, which letter the agents say reached them on the 6th and hence after the loss. Lewis sued both Travelers and the agents, who in turn cross-claimed against each other. On motion, the trial court found the agents had "apparent" authority to act for Travelers and gave judgment for Lewis against it. Travelers does not challenge that judgment. On the trial of the cross-claim of Travelers against the agents, the trial court, sitting without a jury, found the agents acted without actual authority and therefore had to indemnify Travelers for the amount of the loss. The Appellate Division affirmed in an unreported opinion, and we granted the agents' petition for certification. 50 *N. J.* 287 (1967).

The risk here involved is known as "inland marine." The agency contract dated July 14, 1954 authorized the agents to accept proposals for "Fire and Marine" lines of insurance and to issue and renew policies with respect thereto, but as to a "marine" line, which the parties agree is here involved, the writing expressly provided:

"Authority to bind the Company and/or to issue and renew policies of insurance pertaining to Marine Lines is not covered by this contract but may be extended specifically by an authorized representative of the Company in writing."

Travelers explains there are moral and other hazards peculiar to inland marine risks by reason of which applications should receive more critical attention. Nonetheless the contract expressly stated that authority to bind could be granted. When an earlier contract was made with Curran alone in 1953 (it was superseded in 1954 by the contract already mentioned when Curran and Sykes formed a partnership), Travelers expected Curran to solicit risks of this kind, saying in its letter to him, dated July 23, 1953, that it was "looking forward to receiving a good volume of Cas-

ualty, Fidelity and Surety and Inland Marine business from your agency," and by letter of July 29, 1953, in which Travelers extended authority to Curran to bind automobile risks, it concluded:

"In case you feel as though you need binding privilege in other lines, please advise and I will furnish you with the necessary authority * * *."

Curran insists he did ask for and receive authority to bind with respect to inland marine coverage, but he was unable to produce a writing to support his claim. We accept the premise that Travelers never in so many words authorized the agents to bind a risk in that category.

The case turns upon the conceded fact that in accepting some 300 inland marine risks submitted by the agents over a period of years, Travelers in every case dated the policy as of the date requested, backdating the policy to the date of the application whenever coverage was sought as of that time. Backdating, Travelers says, is the uniform practice in the industry. Nonetheless, it says this practice does not bespeak authority in the agent to issue a binder, but rather means only that if Travelers should decide to accept the application, coverage will attach retroactively to the date requested in the application. Under that view, the applicant would hold the interim risk if Travelers should reject the application after a loss, while Travelers, if it issued the policy, would obtain a full premium for the period during which it held the option to accept or reject the application even though at the time of acceptance Travelers knew there had been no loss and of course no risk. Travelers says the picture is not really one-sided because the insured would be covered if the policy was issued after a loss, and Travelers, if it knew a loss had already occurred, would nonetheless consider the application with sheer objectivity. No mention is made of any standard whereby its judgment could be tested, nor of a time period within which the insured's interest would be in limbo. Travelers adds that when it rejected an inland marine application which sought retroactive coverage, it

received no premium, whereas if it rejected an application with respect to a risk as to which a binder was issued with authority, it was entitled to a premium for the period of the binder. Curran, however, testified that in practice no such distinction was drawn, saying that as to an admittedly valid binder in any line Travelers never charged a premium if it refused to issue the policy, presumably because the sum involved did not warrant the bookkeeping.

There is no suggestion that Travelers instructed the agents to advise an applicant for inland marine insurance that the risk of loss would stay with the applicant for the unspecified period during which the application would be processed and that Travelers would hold an option to reject or accept the risk retroactively. Yet it is plain that the owner of property who wants immediate coverage is led not to seek it elsewhere when an application prepared by a company agent speaks in terms of protection as of the date of the application. The unfairness of an undisclosed option in the company is evident. *Cf. Allen v. Metropolitan Life Ins. Co.*, 44 *N. J.* 294 (1965). Equally obvious is the room for overreaching either by an agent eager to get the business or by a company which learns of a loss before acting on the application.[1]

For these reasons the cases hold that a practice of backdating the policy to the date requested in the application spells out authority in the agent to give a binder for interim coverage pending action upon the application. *U. S. F. & G. Co. v. Goldberger*, 13 *F. 2d* 779, 780 (3 *Cir.* 1926); *National Liberty Ins. Co. of America v. Milli-*

---

[1] Indeed in this case Travelers could hardly persuade Mr. Lewis that it rejected his application in ignorance of the fire, because although the branch manager who made that decision says he did so on September 4, Curran insists the letter was postmarked at the Travelers office on the afternoon of September 5, after the branch manager admittedly had learned of the fire through a news broadcast early on the 5th. Whether the manager's testimony in this regard is truthful is not important. We mention these circumstances to indicate the kind of controversy which would inhere in Travelers' practice if a court gave it the legal consequences for which Travelers contends.

*gan,* 10 *F. 2d* 483, 485 (9 *Cir.* 1926); *Nertney v. National Fire Ins. Co.,* 199 *Iowa* 1358, 203 *N. W.* 826, 827–828 (*Sup. Ct.* 1925); *Boever v. Great American Ins. Co., N. Y.,* 221 *Iowa* 566, 266 *N. W.* 276 (*Sup. Ct.* 1936); *Hurd v. Maine Mutual Fire Ins. Co.,* 139 *Me.* 103, 27 *A. 2d* 918, 924 (*Sup. Jud. Ct.* 1942); *Koivisto v. Bankers' & Merchants' Fire Ins. Co.,* 148 *Minn.* 255, 181 *N. W.* 580, 582 (*Sup. Ct.* 1921); *Glens Falls Indemnity Co. v. D. A. Swanstrom Co.,* 203 *Minn.* 68, 279 *N. W.* 845, 846–847 (*Sup. Ct.* 1938); 4 *Couch, Insurance 2d* (1960), § 26:198, at *p.* 50; but *cf. Thetford v. Hartford Fire Ins. Co.,* 27 *Tenn. App.* 600, 183 *S. W. 2d* 314, 316–317 (*Ct. App.* 1943).

The cases just cited deal with a controversy between the applicant and the carrier. As we noted earlier, Travelers did not appeal from the judgment the applicant obtained against it. The question is whether those cases are also meaningful when the carrier turns to the agent for indemnification. We think they are, for although it was unnecessary in those cases to decide whether the carrier was liable because the agent's authority was merely "apparent" rather than implied in fact and therefore actual, nonetheless the ultimate basis for those cases would equally support a finding of authority as between the agent and the principal. We say this because the theme was not that the fact of agency itself necessarily included apparent authority to bind the risk, but rather that it was the company's practice of backdating which imported the existence of the authority to bind. If such conduct on the part of the principal could reasonably lead the agent too to believe he has authority to bind the risk, then the principal should be equally chargeable with the implication of its conduct in a controversy with the agent.

Thus in discussing "apparent authority," *Restatement (Second) of Agency* (1958), § 8, comment "a", *p.* 30, says:

"Apparent authority results from a manifestation by a person that another is his agent, the manifestation being made to a third person

and not, as when authority is created, to the agent. It is entirely distinct from authority, either express or implied. The power to deal with third persons which results from it may, however, be identical with the power created by authority as it is where the principal's statements to the third person are the same as to the agent and are similarly interpreted * * *"

In the same vein, comment "e" to § 27 of *Restatement (Second) of Agency* (1958), *p.* 106, says:

"*Similarity of authority and apparent authority.* The scope of apparent authority in any given case may be different from or identical with the authority which the agent has if the same manifestation is made to both agent and the third person. If these two persons have the same information, or if the manifestation is entirely unambiguous, the apparent authority of the agent is the same as the authority of the agent. To the extent that they are the same, it is immaterial upon what grounds the principal is made a party to a transaction conducted by the agent. If they are different, the transaction is effective if the agent has either authority or apparent authority."

In short, an agent is in fact authorized to do "what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts," *Restatement (Second) of Agency* (1958), § 33, *p.* 115; and with exceptions not here relevant, "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account," *Restatement (Second) of Agency* (1958), § 26, *p.* 100. And if the authorization is ambiguous, the agent has authority to act in accordance with what he reasonably believes to be the wish of the principal even though it is contrary to the principal's actual intent. *Restatement (Second) of Agency* (1958), § 44, *p.* 135; *Mechem, Agency* (4th ed. 1952), § 519, *p.* 385; 3 *Am. Jur. 2d, Agency,* § 206, *p.* 586; 3 *C. J. S. Agency* § 148, *p.* 31.

Curran testified that he was led by the practice of backdating to believe that he was authorized to bind the risk

while Travelers considered the application. We see no reason to doubt the truthfulness of that testimony or the reasonableness of that belief. As we have already said, it would be unreasonable to expect an applicant for insurance to give any one company an option, indefinite as to time, to decide whether to sell coverage retroactively with the applicant holding the interim risk. The practice of backdating the policy which would lead the applicant to believe the agent is authorized to bind the risk would, if no more were shown, lead an agent to the same estimate of his authority. That conclusion is so strongly required that an insurer could escape it only through the plainest instructions to the agent to tell an applicant for immediate coverage in so many words (1) that the interim loss will fall upon the applicant if the application is rejected by the company; (2) the period of time within which the company will act on the application; (3) the objective standard upon which the company will weigh the application, or the absence of such a standard; and (4) that a premium will be charged at the full rate for the period of retroactive coverage if the policy should issue. We doubt that a company which so instructed its agents would remain competitive. We do not suggest such instructions would bar the applicant if the agent failed to abide by them. Rather the point is that a principal who, as in this case, wants to shift the interim insurance risk to the agent because he failed so to inform the applicant would have to alert the agent to that consequence by such explicit instructions.

██ Travelers contends the agents' letter to it with respect to the Lewis application revealed an awareness of a lack of power to issue a binder. The letter read that "we now would like a camera and equipment floater issue effective this date if possible." Travelers says "if possible" related to "effective this date." It should not be so construed since Travelers itself agrees the uniform practice was to issue the policy, if at all, as of the date requested. Hence "if possible" must relate to the issuance of a policy rather than to the effective date if the policy should issue. The agents add that

Travelers' letter refusing to issue the policy implicitly acknowledged the agents' power to bind, since it requested the agents to cancel "the captioned binder in accordance with its terms and conditions." Travelers' manager testified the wrong form was used inadvertently. We think it unnecessary to pass on the credibility of that explanation. We prefer to hold that a practice of backdating policies to the date requested in the application implies, as between principal and agent, authority in the agent to bind a risk pending the principal's decision on the application.

■■ Finally Travelers contends that the written agency agreement of 1954 barred a grant of authority other than by a writing. It refers to the provision that authority to bind as to a marine line "may be extended specifically by an authorized representative of the Company in writing." The short answer is that, if the contract be read as Travelers would read it, nonetheless the parties did not thereby disable themselves from amending, supplementing or replacing the contract by a later agreement made orally or by conduct objectively manifesting a new understanding. *Headley v. Cavileer*, 82 *N. J. L.* 635 (*E. & A.* 1912); *Frank Wirth, Inc. v. Essex Amusement Corp.*, 115 *N. J. L.* 228 (*E. & A.* 1935); 1 *Corbin, Contracts* (1963), § 31, *pp.* 116–117; 6 *Corbin, Contracts* (1962), § 1295, *p.* 205. And of course, the parol evidence rule did not bar proof of changes subsequent to the execution of the integrated writing. *Restatement (Second) of Agency* (1958), § 48, comment "b", *p.* 143.

The judgments of the Appellate Division and the trial court are reversed and the matter remanded to the trial court with directions to enter judgment for the agents on Travelers' cross-claim against them.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.