279 N.J. Super. 5 (1995)
652 A.2d 178
DAVID BAHRLE, IDA BAHRLE, MICHAEL BAHRLE, WILLIAM BAHRLE, STEVEN BAHRLE, PATRICIA BAHRLE, KYLE BAHRLE, KAREN BENHAM, MICHAEL BENHAM, CARLEY BENHAM, MICHAEL BENHAM, KENNETH BERGMANN, JASON BERGMANN, DONNA BERGMANN, MICHAEL BERGMANN, CAROLE BRILLY, KATHLEEN BRILLY, MAY BETH BRILLY, PATRICK BRILLY, PATRICIA BRILLY, RUTH CERVASIO, THOMAS CERVASIO, TAMMY CLAYTON, BRYAN CLAYTON, NICOLE CLAYTON, SEAN CLAYTON, BRYAN CLAYTON, HILLARY DONOHUE, ROBERT DONOHUE, DAWN DONOHUE, MERRILEE DONOHUE, TIFFANY DONOHUE, DOROTHY FORTUS, STEPHEN FORTUS, DEBRA FORTUS, SHERRY FRICK, THOMAS FRICK, ATRINA FRICK, DAVID GALLINA, ELLEN GALLINA, KAREN GALLINA, KRISTINE GALLINA, ANDREW GLATZ, BERTHA GLATZ, FREDERICK GLATZ, PAUL GLATZ, CHERYL HEDBERG, JOHN HEDBERG, MICHELE HEDBERG, NORA HENNESSEY, MARIE HOWELY, ELEN KLEIN, JOSEPH KLEIN, PATRICIA KLEIN, THERESA KLEIN, DALE KNOTT, DENISE KNOTT, IRENE KNOTT, GEORGE LEARY, III, JUDITH LEARY, SEAN LEARY, TARA SCANLON LEARY, JEAN LUZETSKY, JOHN LUZETSKY, ROBERT LUZETSKY, JANENE LUZETSKY, ELENOR MCCORRY, MICHAEL MANGAN, SR., ELAINE MANGAN, MICHAEL MANGAN, JR., TARYN MANGAN, WILLIAM MANGAN, JR., JUDITH MANGAN, CHRISTOPHER MANGAN, WILLIAM MANGAN, III, NOAH MANGAN, PATRICK MANGAN, WILLIAM MANGAN, SR., GRACE MANGAN, PETER MANGAN, ELLEN MARANO, SALVATORE MARANO, DORIS MEEHAN, JAMES MEEHAN, MICHAEL METELSKY, ANITA O'BRIEN, THOMAS O'BRIEN, SR., CHARLES OBRZUT, STELLA OBRZUT, LUCILLE PETERS, HELMUTH PETERS, CHRISTINE PETERSON, ROBERT PETERSON, CATHLEEN PETRIN, NICHOLAS PETRIN, STEFFANY PETRIN, TIMOTHY PETRIN, JOAN PONTICELLO, MATTHEW PONTICELLO, RENE PONTICELLO, TINA PONTICELLO, CATHRYN POPP, GENE SANTUCCI, JUDITH SANTUCCI, DIANE SANTUCCI, JOSEPH SANTUCCI, MICHAEL SANTUCCI, THERESA SANTUCCI, TIMOTHY SANTUCCI, EDWARD SCANLON, HEATHER SCANLON, CHAD SCANLON, DREW SCANLON, DIEDRE SCANLON, JAMES SMITH, MARGARET SMITH, MARIE SMITH, DONNA SMITH, RICHARD SPAFFORD, SUSAN SPAFFORD, RICHARD SPAFFORD, JR., RONALD SPAFFORD, WENDY SPAFFORD, PATRICIA VANDERKAM, CHRISTOPHER VANDERKAM, MARK VANDERKAM, EDWARD VANDERKAM, LYNN VANDERKAM, BENJAMIN WEDEKIND, FRANK WEDEKIND, KEVIN WEDEKIND, MARY WEDEKIND, KENT WEDEKIND, ELIZABETH BETZ, LAWRENCE BETZ, WILLIAM MAGYARITS, CAROL McMAHON, PATRICK McMAHON, HAZEL PETERSON, JOSEPH PINO, LINDA PINO, ANGELA PINO, JOSEPH PINO, ANGELA RIZZO, ANTHONY RIZZO, CHRISTINE RIZZO, JOAN RIZZO, PLAINTIFFS-APPELLANTS,
v.
EXXON CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY DOING BUSINESS AS EXXON CO., USA; TEXACO CORPORATION, A CORPORATION OF THE STATE OF DELAWARE; RICHARD E. RITCHIE AND SUSAN M. RITCHIE, TRADING AS LACEY EXXON; CHARLOTTE W. RULE AND THE ESTATE OF DONALD W. RULE, T/A RULE'S SERVICE STATION, DEFENDANTS-RESPONDENTS, AND KALSCH-FORTE OIL CO., INC., A/K/A K-FORTE OIL CO., A CORPORATION OF THE STATE OF NEW JERSEY; "JOHN DOE" DEFENDANTS B THROUGH Z; "JOHN DOE" DEFENDANTS 1 THROUGH 10; "JOHN ROE" DEFENDANTS B THROUGH Z; "JOHN ROE" DEFENDANTS 1 THROUGH 10, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1994.
Decided January 9, 1995.
*14 Before Judges PETRELLA, HAVEY and BROCHIN.
*15 Alan H. Sklarsky argued the cause for appellants (Tomar, Simonoff, Adourian & O'Brien and Carl J. Valore, attorneys; Michael S. Rothmel, of counsel and on the brief).
Robert T. Lehman argued the cause for respondent Exxon Corporation (Archer & Greiner, attorneys; Debra S. Rosen, on the brief).
David P. Schneider argued the cause for respondents Richard and Susan Ritchie (Bressler, Amery & Ross, attorneys; Mr. Schneider, on the brief).
James Crawford Orr argued the cause for respondent Texaco Refining and Marketing, Inc. (Wilson, Esler, Moskowitz, Edelman & Dicker, attorneys; Mr. Orr, on the brief).
Donald W. Rule, appellant, argued pro se (Mr. Rule adopts the brief filed on behalf of respondent Texaco Refining and Marketing, Inc.).
The opinion of the court was delivered by HAVEY, J.A.D.
In this groundwater contamination case, plaintiffs, 143 residents of the Barnegat Pines Development area in Lacey Township, Ocean County, appeal from a judgment entered on a jury verdict dismissing all claims against defendants Texaco Corporation and Donald W. Rule. Prior to trial, plaintiffs' complaint was dismissed by summary judgment in favor of defendants Exxon Corporation and Richard E. and Susan M. Ritchie, t/a Lacey Exxon (hereinafter referred to collectively as Exxon/Ritchie). During trial, which was limited to liability issues, plaintiffs sought to prove that gasoline from Rule's service station, which had operated between 1959 and 1975 as a Texaco Station, had seeped into the groundwater and contaminated their wells. Plaintiffs advanced negligence and strict liability theories against Rule. They also claimed that Texaco was liable, first because it owned the underground tanks from which the gasoline allegedly leaked into the aquifer, and second because it was vicariously liable for Rule's conduct based *16 on an apparent authority theory. The jury returned a verdict of no liability in favor of both defendants.
On appeal, plaintiffs argue that: (1) the trial judge erred in permitting Texaco to submit proofs that the contamination in plaintiffs' wells was attributed to post-1975 gasoline discharges caused by Exxon/Ritchie, since Exxon/Ritchie had been dismissed from the suit by summary judgment; (2) the testimony of plaintiffs' experts was erroneously precluded; (3) the jury finding that Kalsch-Forte, rather than Texaco, owned Rule's underground tanks was against the weight of the evidence; (4) the trial judge erred in failing to charge res ipsa loquitur, and in charging that strict liability applied only to underground tank leaks; and (5) the nuisance claims were wrongly dismissed. We affirm as to Texaco and reverse and remand for a new trial as to Rule.
The procedural history is significant. This action was originally instituted by 258 plaintiffs.[1] Pursuant to a Case Management Order, plaintiffs were divided geographically into three zones. The present litigation involves plaintiffs situate in the "western zone," whose claims were against Exxon, the Ritchies, Texaco and Rule.
By order dated January 5, 1990, summary judgment was granted in favor of Exxon and the Ritchies dismissing with prejudice the claims against them of nearly all of the plaintiffs. The related cross-claims of codefendants Texaco and Rule against Exxon/Ritchie, were likewise dismissed with prejudice. Thereafter, the Ritchies and Exxon settled with the remaining plaintiffs. Texaco's subsequent motion to reinstate its cross-claims against the Ritchies was denied.
During motions entertained at the commencement of trial, the trial judge (not the same judge who granted summary judgment) ruled that Texaco and Rule were not precluded by the summary judgment from submitting proof that any contamination found in *17 plaintiffs' wells was due to Exxon/Ritchie's conduct. Plaintiffs' motion to reopen the summary judgment orders in favor of Exxon/Ritchie was denied.
Facts revealed during the jury trial that in 1959, Rule and his father (now deceased), built a gasoline station on Lacey Road in Lacey Township. They arranged with an independent gasoline distributor, Kalsch-Forte, to install the necessary underground tanks and to supply Texaco gasoline. Kalsch-Forte installed the underground tanks and leased them to Rule. During the ensuing years the size and number of tanks were upgraded to a capacity of approximately 17,000 gallons.
During Rule's tenure at the station, he sold gasoline and performed oil changes, greasing, and exhaust work. Originally the station contained a floor drain, but Rule filled it with concrete after about one year. Waste oil was drained into a fifteen-gallon drum on wheels, and any spilled oil was taken up by absorbent material and put in the trash. The second bay, used for tune-ups, had no drain. The third bay, used mostly for brake work, had a drain. Initially Rule hosed down the floor, but to save water he soon switched to swabbing it once a week and sweeping every day. Ritchie converted the station to an Exxon station and in October 1975 purchased the underground tanks from Kalsch-Forte.
In 1981, residents of the Barnegat Pines area noticed a foul smell in their well water and reported the condition to the municipal authorities. Tests revealed volatile organic contaminants (VOCs) in some well water, including benzene, ethylbenzene, toluene and xylene. In some wells, all of the contaminant levels exceeded Department of Environmental Protection (DEP) standards. A subsequent DEP examination of the area determined that the potential source of contamination flowed south in the Cohansey Aquifer from Lacey Road toward Deer Head Lake. Monitoring wells were installed in the area. Only one of the monitoring wells, that at the Exxon station, showed signs of contamination. Thus, the DEP identified the gasoline station as the most likely source of contamination.
*18 The thrust of plaintiffs' proofs at trial was that the contamination of plaintiffs' wells was caused by discharge of gasoline and other petroleum products occurring between 1959 and 1975, when Rule operated his Texaco station. Plaintiffs' experts rejected post-1975 discharges (during the time Exxon/Ritchie operated the station) as a causative factor because Exxon discharges into the groundwater (the "Exxon plume") would not have had time to reach any more than eight of the plaintiffs' homes, which were within a one and one-and-one-half block radius of the station. These plaintiffs, after summary judgment was granted to Exxon/Ritchie, settled with Exxon.
Indeed, on Exxon/Ritchie's summary judgment motions, both Exxon's expert, Environmental Resources Management (ERM) and plaintiffs' expert, Donald Bello, had agreed that any discharge from the gasoline station during the Exxon/Ritchie era could not have reached the remaining plaintiffs' wells. This conclusion was reached based on the maximum distance any contaminant could have travelled by applying groundwater velocity rates ranging between 114 and 91 feet per year. ERM identified three potential sources of contamination in the western zone: (1) the gasoline station; (2) septic system discharges; and (3) home automobile repairs. Because of the groundwater velocity rate, ERM concluded that the "Exxon plume" contamination was caused by a discrete event, a spill, occurring in 1986, and did not affect any of the plaintiffs' wells except those within the one and one-and-one-half block radius of the station.
At trial, Bello basically agreed with the groundwater flow rate range established by ERM, 91 to 114 feet per year, but favored the lower end of the range and noted that particular contaminants, like benzene, would flow even slower. He agreed with ERM that based on the flow rate the contamination attributable to the gasoline station between 1975 and 1985 was geographically limited to the Exxon plume.
However, Bello believed that additional contamination was attributable to earlier discharges. Based on positive well tests, the *19 nature of the contaminants found in the area, probable contaminant "pathways," years of residence and house location, he identified twenty-two families whose wells were probably contaminated by pre-1975 discharges from the gasoline station.
The trial judge charged the jury that Rule could be found liable based on negligence or a strict liability theory. According to the judge, strict liability was predicated on a private cause of action for damages under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -40, caused by leakage from underground gasoline tanks. The judge also charged that Texaco could be found liable based on strict liability if it owned the underground tanks or, vicariously, if Rule was negligent and there was an apparent agency relationship between Rule and Texaco. In answers to special verdict interrogatories as to strict liability, the jury first found that Kalsch-Forte, and not Texaco, was the owner of the underground oil and gasoline tanks during the time Rule operated the Texaco station between 1959 and 1975. The jury also concluded that the tanks did not leak or cause gasoline or petroleum products to seep into the groundwater during that period. Finally, the jury found that Rule was not negligent in the manner by which he operated the gasoline station during the pertinent period.

I
Plaintiffs first argue that the trial judge erred in allowing Texaco to present evidence that post-1975 discharges from the Exxon/Ritchie gas station contaminated the wells of plaintiffs outside of the Exxon plume. Plaintiffs assert that allowance of such testimony was in direct contradiction to the summary judgment in favor of Exxon/Ritchie dismissing plaintiffs' complaint and cross-claims, and prejudiced their case against Texaco and Rule.
In granting summary judgment to Exxon/Ritchie, the motion judge concluded that, based on both plaintiffs' and Exxon's experts' reports, plaintiffs "could not possibly have suffered damage as a result of any ... toxic contaminants from Exxon's Service *20 Station." This finding was predicated on the undisputed groundwater velocity rate agreed upon by ERM and Bello. Texaco did not oppose the summary judgment motion, and therefore did not submit a report contradicting ERM and Bello. The motion judge thereafter denied Texaco's motion to set aside the dismissal in favor of the Ritchies and also "preclude[d] Texaco from challenging the flow rate and the hydrogeological situation accepted to this point in the case." It was the motion judge's view that to allow new experts to "change what has been accepted as the facts in this matter, specifically the flow rate" would make a "mockery out of case management and court orders entered...."
At trial, the trial judge entertained Texaco's and Rule's motion to submit the testimony of Lloyd LaBrie, a consulting engineer who stated that Exxon/Ritchie's post-1975 conduct contaminated some of plaintiffs' wells. The judge reviewed the transcripts of the summary judgment motions and determined that the summary judgment orders, though ending Exxon's and the Ritchie's legal liability, did not preclude Texaco from arguing that the contamination was due to the conduct of third parties over whom it had no control, including Exxon and Rule. The judge reasoned that Texaco could argue "in defense" that Exxon/Ritchie may have caused the contamination, so long as those proofs and arguments are predicated on the same groundwater flow rates that were contained in the experts' reports.
Based on the trial judge's ruling, Texaco presented LaBrie who concluded that, even accepting the agreed-upon groundwater flow rate, station discharges after 1976 could have reached the well heads of various plaintiffs. On cross-examination, plaintiffs' counsel questioned LaBrie concerning his calculations of flow rates. The trial judge thereupon permitted LaBrie, on redirect, to testify that a station discharge as late as 1980, the year the Ritchies showed a 5,000 gallon inventory shortfall, could have reached some of plaintiffs' well heads.
Entry of the summary judgments in Exxon/Ritchie's favor dismissing plaintiffs' complaint and the Texaco and Rule cross-claims *21 was predicated on the absence of any factual dispute concerning Exxon/Ritchies' potential liability. R. 4:46-2. Dismissal was granted because all the submitted expert reports agreed that, based on groundwater velocity rates, any post-1975 spillage caused by Exxon/Ritchie was not a causative factor in the contamination of plaintiffs' wells. Texaco chose not to submit a competing hydrogeological report. The summary judgment orders, not opposed by Texaco and Rule, were entered with prejudice. A dismissal with prejudice constitutes an adjudication on the merits "`as fully and completely as if the order had been entered after trial.'" Velasquez v. Franz, 123 N.J. 498, 507, 589 A.2d 143 (1991) (quoting Gambocz v. Yelencsics, 468 F.2d 837, 840 (3rd Cir.1972)). In short, there was an adjudication of fact: Exxon/Ritchie's post-1975 conduct was not a cause of the contamination of plaintiffs' wells.
Having decided Exxon/Ritchie's liability fully as a matter of law and fact, the summary judgment orders became the "law-of-the-case." Lanzet v. Greenberg, 126 N.J. 168, 192, 594 A.2d 1309 (1991). Under the law-of-the-case doctrine, "where there is an unreversed decision of a question of law or fact made during the course of litigation, such decision settles that question for all subsequent stages of the suit." Slowinski v. Valley Nat'l Bank, 264 N.J. Super. 172, 179, 624 A.2d 85 (App.Div. 1993), (quoting State v. Hale, 127 N.J. Super. 407, 410, 317 A.2d 731 (App.Div. 1974)).
Of course, the doctrine is "`discretionary and the court is never irrevocably bound by its prior interlocutory ruling....'" Daniel v. State, Dep't of Transp., 239 N.J. Super. 563, 581, 571 A.2d 1329 (App.Div. 1990), certif. denied, 122 N.J. 325, 585 A.2d 343 (1990) (quoting Sisler v. Gannett Co., 222 N.J. Super. 153, 159, 536 A.2d 299 (App.Div. 1987), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988)), and "should be applied flexibly to serve the interests of justice." State v. Reldan, 100 N.J. 187, 205, 495 A.2d 76 (1985).
However, here the trial judge did not exercise discretion to revise the summary judgment orders. Indeed, the judge denied *22 plaintiffs' motion to vacate the dismissals against Exxon and the Ritchies. Instead, the judge held that Texaco could present proofs that spillage during the post-1975 Exxon/Ritchie era affected plaintiffs' wells in support of Texaco's affirmative defense that others were responsible for the contamination. The trial judge erroneously interpreted the summary judgment orders as preserving Texaco's right to construct a new factual and scientific theory against Exxon and the Ritchies, despite the prior adjudicated finding that the Exxon/Ritchie spillage was not a causative factor. Allowance of LaBrie's testimony established the "empty chair" defense, permitting Texaco and Rule to point their fingers at Exxon and the Ritchies, no longer parties to the action, by claiming that their activities were the cause of the contamination. On the strength of LaBrie's expert testimony, Texaco's counsel argued during summation that: (1) "discharges at the ... Exxon station [and local sources] are the problem in this case"; (2) in 1980, "Ritchie couldn't explain [why] he had 5,000 gallons of unexplained inventory loss"; and (3) "this is an Exxon/Ritchie problem." Because of the dismissal of Exxon and the Ritchies as party-defendants, plaintiffs were not prepared to advance an evidentiary basis to challenge this "empty chair" defense.[2]
Further, aside from the preclusive effect of the summary judgment orders, Texaco should have been judicially estopped from raising its newly-found theory against Exxon/Ritchie. See Levin v. Robinson, Wayne & LaSala, 246 N.J. Super. 167, 179-80, 586 A.2d 1348 (Law Div. 1990) (judicial estoppel precludes a party from assuming a position in a legal proceeding totally inconsistent with the one previously asserted in the same or another proceeding). Judicial estoppel is a principle of equity, but unlike equitable estoppel it "looks to the connection between the litigant and the judicial system" rather than the relationship between the parties. Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, *23 419 (3rd Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). Its fundamental premise is to protect the integrity of the judicial system by preventing litigants from "`playing fast and loose'" with the court "to suit the exigencies of self interest." USLIFE Corp. v. U.S. Life Ins. Co., 560 F. Supp. 1302, 1304-05 (N.D.Tex. 1983) (quoting Scarano v. Central R. Co., 203 F.2d 510, 513 (3rd Cir.1953)).
Fourteen months after the January 6, 1990 summary judgment orders, and eighteen months after the deadline imposed by a Case-Management Order for the submission of expert reports, Texaco moved to reinstate its cross-claims based upon LaBrie's hydrogeological report it had obtained approximately two months earlier. In denying the application, the motion judge found that:
The [summary judgment] motion was not opposed by anyone. No one even asked that it be delayed for discovery purposes, or for any other reason, and then the Court granted the motion as unopposed.
The judge also explained that after the summary judgment orders were entered and during ensuing settlement discussions, all counsel were specifically asked whether any party intended to produce further expert hydrogeological reports, and Texaco's counsel:
represented, not only to counsel in the matter but to the Court, Texaco was not going to produce an expert or obtain an expert in regard to the matter. As a result of all of that, counsel entered into a settlement.
Texaco should not have been permitted to shift gears and focus on Exxon/Ritchie's liability at trial when it had made a tactical choice not to oppose Exxon/Ritchie's summary judgment motions by submitting a competing hydrogeological report.
Although admission of LaBrie's testimony was error, we are satisfied that it was harmless error as to Texaco. For the reasons hereafter expressed, we agree with Texaco that the jury's finding that the underground tanks were owned by Kalsch-Forte and not Texaco, is fully sustainable. We also agree that there is no basis in fact or law supporting plaintiffs' claim that Texaco was vicariously liable for Rule's conduct during his pre-1975 operation of the gas station. Therefore, there was no evidentiary basis to *24 find Texaco liable under either strict liability or negligence, even without the offending testimony presented by LaBrie.
The error was not harmless, however, as to Rule. See Ratner v. General Motors Corp., 241 N.J. Super. 197, 206, 574 A.2d 541 (App.Div. 1990). It is true that the jury found that Rule was not negligent in the manner by which he operated the station, and that the underground tanks did not leak during his tenure. However, without LaBrie's testimony that the Exxon/Ritchie station was a source of contamination, the jury would have had to decide whether the contamination in plaintiffs' neighborhood was caused by Rule's pre-1975 operation, or sources caused by local residential activities, such as plaintiffs' own spillage of petroleum products. The DEP's investigating geologist ruled out "local activities" as the source because of the "very high levels of groundwater contamination." Thus, allowance of LaBrie's testimony that Exxon/Ritchie's post-1975 activity was a source of contamination could well have invited the jury to conclude that it was the sole source of contamination. Such a conclusion would have permitted the jury to find that Rule was not negligent and not a cause of the contamination, despite plaintiffs' proofs to the contrary. We therefore reverse and remand for a new trial as to Rule.

II
Plaintiffs argue that if LaBrie's testimony had been excluded and Rule had been found negligent, the jury could have found Texaco vicariously liable based on the doctrine of apparent authority.
Rule, not Texaco, owned the service station in question. There was no evidence adduced that Texaco was at all involved in the construction or operation of the station or in the installation of the groundwater tanks and other station fixtures. No franchise or licensing agreement was admitted into evidence showing that Rule was anything other than an independent service station operator. He purchased his gasoline from Kalsch-Forte throughout his *25 tenure, except for a brief period during the energy crisis in the early 1970's, when he obtained the gasoline directly from Texaco. Thus, based on these facts, there was no evidence to impose a direct duty on Texaco's part to guard against the condition which allegedly caused the contamination of plaintiffs' wells. See Wallach v. Williams, 103 N.J. Super. 195, 199, 247 A.2d 17 (App.Div. 1967), aff'd, 52 N.J. 504, 246 A.2d 713 (1968).
The issue concerning Texaco's liability, as framed by the trial judge, was whether it may be held vicariously liable under the doctrine of apparent authority. A "Texaco" sign was annexed to the station and Texaco's "fire chief" and "sky chief" emblems were depicted on the station pumps. Also, Rule and his employees wore uniforms with the Texaco emblem. Consequently, the trial judge instructed the jury to decide whether or not the use of the Texaco "signage, uniforms ... product signs or the trade mark ... conveyed to the neighboring community the impression by means of the appearance of the station or by media advertising generally in respect to the activities conducted there that the station was controlled by the oil company known as Texaco." The instruction was given predicated on plaintiffs' theory that such conveyance of an appearance of control by Texaco would impose vicarious liability upon it for Rule's negligent acts. The jury did not answer this question in view of its finding that Rule was not negligent and that the underground tanks did not leak during his tenure at the station.
Apparent authority results from a manifestation by a person that another is his agent. Lewis v. Travelers Ins. Co., 51 N.J. 244, 250-51, 239 A.2d 4 (1968); Restatement (Second) of Agency § 8 comment a. at 30 (1958). Apparent authority arises when a principal "acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or may not possess." Lampley v. Davis Mach. Corp., 219 N.J. Super. 540, 548, 530 A.2d 1254 (App.Div. 1987). In addition, the "essential element of reliance" must exist before apparent authority can be found. Wilzig v. Sisselman, 209 N.J. Super. 25, *26 36, 506 A.2d 1238 (App.Div.), certif. denied, 104 N.J. 417, 517 A.2d 415 (1986).
Apparent authority may exist in the context of a relationship between an oil company and a service station owner.
In Wallach, 52 N.J. at 506, 246 A.2d 713, the Supreme Court formulated the rule by positing the following question:
If an oil company ... gives the impression, by means of the appearance of a service station which it has leased to an independent contractor, or by means of its radio, television, or other media advertising with respect to the activities conducted there ... to the ordinary service-purchasing motorist that it is operating the station or sufficiently in control of it for the purpose of extending an invitation to the public to buy the products or services available there, may the negligence of the lessee or his employees which results in injury to a motorist purchasing service at the station in reliance upon that impression or apparent invitation be imputed to such oil company?
Ibid. Based on the record before the Court, it determined that plaintiff's proofs were not sufficient to "call for a decision on this question." Id. at 506, 246 A.2d 713. Thus, evidence that an oil company had represented through signs and advertising that it operated the service station where an attendant injured a patron and the patron had relied on those representations, raised a fact issue as to the company's apparent authority over the service station. Shadel v. Shell Oil Co., 195 N.J. Super. 311, 317, 478 A.2d 1262 (Law Div. 1984); accord Gizzi v. Texaco Inc., 437 F.2d 308, 310 (3rd.Cir.1971) (Texaco's advertising urging reliance on station operators who wear Texaco's signature, and customer's reliance thereon by having his brakes repaired at the station, raised fact issue as to apparent authority), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 57 (1971); see also Green v. Shell Oil Co., 181 Mich. App. 439, 450 N.W.2d 50, 52-53 (1989).
Here, the jury charge as to apparent authority was deficient because it failed to include the essential element of reliance. Moreover, on the trial record before us, there was no basis for the jury to find reliance. Unlike Shadel and Gizzi, this is not a case where a patron had relied on the oil company's insignia or its advertising in seeking out the service of a local station, and was injured as a result of that service being rendered. Plaintiffs *27 produced absolutely no evidence that they in any manner relied upon the fact that Rule's station was a Texaco station. Not a single plaintiff testified that they moved into the area ultimately contaminated in reliance on the fact that the station displayed the Texaco insignia. Nor is there any proof that plaintiffs remained residents in the neighborhood during the Texaco/Rule era because they had relied on the fact that Texaco was in control of the station and would thus prevent it from becoming a source of contamination. Therefore, there was no factual or legal basis to hold Texaco liable on a vicarious liability theory.

III
As stated, the jury found that Kalsch-Forte, and not Texaco, was the owner of the underground gasoline storage tanks which plaintiffs allege leaked and caused the contamination of their wells. Plaintiffs now argue that not only is this finding against the weight of the evidence, but that the issue should not even have been submitted to the jury because of Texaco's own interrogatory answer admitted ownership of the tanks.[3]
There was an ample evidentiary basis for the jury to conclude that the storage tanks and equipment were owned by Kalsch-Forte, an independent contractor. Rule testified that he leased the tanks from Kalsch-Forte, who upgraded them periodically and that he never negotiated with Texaco on the sale or lease of the tanks. Ritchie also testified that after he bought the station from Rule in 1975 he negotiated with Kalsch-Forte, not Texaco, to buy the tanks and equipment and that his payment check for the eventual purchase was payable to Kalsch-Forte.
Despite this evidence, plaintiff now contends that Texaco was bound by its interrogatory answer read to the jury stating "to the best of Texaco's knowledge, Texaco owned five tanks at the *28 site which were sold to Richard Ritchie in December [1975], only as revealed by the attached documents." In arguing that Texaco is bound by the answer, plaintiffs rely on Skibinski v. Smith, 206 N.J. Super. 349, 353, 502 A.2d 1154 (App.Div. 1985), where we held that a party may not introduce at trial evidence of facts inconsistent with those admitted in interrogatories. The testimony establishing that the tanks were owned by Kalsch-Forte was not objected to by plaintiffs based on this "admission" by Texaco. We therefore consider the issue applying the plain error standard. R. 2:10-2.
Texaco's answer to the interrogatory was not unequivocal; it states nothing more than "to the best of Texaco's knowledge," it admitted ownership to the extent of its reliance "on attached documents." Presumably the documents concerned the sale of the station from Rule to the Ritchies, which involved the sale of the tanks from Kalsch-Forte to the Ritchies. Another document introduced into evidence by plaintiffs themselves, a tank leasing agreement dated March 1, 1972, demonstrated that the tanks were leased to Rule by Kalsch-Forte, and not Texaco. Thus, in view of the ambiguous nature of Texaco's answer, the trial judge did not commit plain error in permitting the evidence of Kalsch-Forte's ownership of the tanks into evidence. Moreover, Texaco claims, without contradiction by plaintiffs, that it served an amendment to its interrogatory answer which denied ownership of the tanks. Although the amendment was not submitted to the jury, in our view it removed any possible rationale for binding Texaco to its initial answer. Consequently, once all of the evidence was admitted, the jury's finding that Kalsch-Forte owned the tanks was not clearly against the weight of the evidence. Corrino v. Novotny, 78 N.J. 355, 360-61, 396 A.2d 561 (1979).

IV
Plaintiffs next argue that the trial judge erred in barring the testimony of its expert, Albert D. Young, concerning the standard of care in the industry, sources of gasoline spills at the *29 Rule/Texaco station and the relationship between Rule and Texaco.
Young, a consultant in petroleum distribution and a retired Exxon employee, had thirty-five years of experience in overseeing, viewing and evaluating the distribution, storage and retail sale of gasoline. During an Evidence Rule 8 hearing (now N.J.R.E. 104(a)), Young testified that the complaint of suspected gasoline contamination of wells in the present case was typical of the kind of situation he had frequently investigated. According to Young, the service station probably spilled gasoline "more frequently than not" between 1959 and 1975 and the spilled gasoline would have seeped to the groundwater. Young's opinion was based on his knowledge that such discharges were routine occurrences in probably all 200,000 service stations ever in existence.
Also, after considering the results of soil gas studies showing the presence of petroleum vapors in the soil of the old tank field at the station, Young found it more probable than not that spills would have occurred during deliveries in the pre-1975 period because when tank sizes failed to keep pace with truck capacities, overfills were routine at all stations. Such spills could have gone undetected by the station owner. Young also considered the type of drain Rule had in his service bays and opined that an oil-water separator could have prevented any release of oil into the ground. Young acknowledged that he never viewed the station and had no direct knowledge of the plant or its practices or operations.
The trial judge barred Young's testimony, explaining that to allow it would be "to assume negligence." The judge found that Young attempted to show negligence solely through his experience at other service station locations, and reasoned that Young's conclusions based on experience elsewhere, without evidence of similar conduct at this station, would be without value because it was unsupported by factual evidence and would interfere with the jury's evaluation.
Plaintiffs argue for the first time on appeal that without Young's testimony the jury had no standard of care against which to *30 evaluate Rule's conduct to determine if he was negligent. They also urge that without his testimony they lost the opportunity to establish a claim of direct negligence against Texaco, predicated on major oil companies' duty to counsel service stations on the proper method to operate a station where the oil companies' product was being sold.
An expert must "be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion." State v. Moore, 122 N.J. 420, 458-59, 585 A.2d 864 (1991), (quoting State v. Odom, 116 N.J. 65, 71, 560 A.2d 1198 (1989)); N.J.R.E. 702. The facts or data upon which the expert bases his or her opinion may be those perceived by or made known to the expert at or before the hearing and, if of a type reasonably relied upon by experts in the discipline in question in forming opinions, the facts or data need not be admissible in evidence. N.J.R.E. 703. Of course, "[t]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which the opinion is predicated." Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984), (quoting Biunno, Current New Jersey Rules of Evidence, Comment 7 on Evid.R. 56 (now N.J.R.E. 701-704)). See also Bellardini v. Krikorian, 222 N.J. Super. 457, 463, 537 A.2d 700 (App.Div. 1988). Without some evidentiary support offered for the expert's conclusion, the evidence is inadmissible as a net opinion. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981).
It is true we have held that the evidentiary support for expert opinion "can be based on what the witness has learned from personal experience or from persons with adequate training and experience." Bellardini, 222 N.J. Super. at 462, 537 A.2d 700. However, in Bellardini, the expert was drawing upon his past experience in establishing a medical standard of care and in concluding that the treatment by a physician fell below that standard. Id. at 460, 537 A.2d 700. Here, despite plaintiffs' argument on appeal, Young's testimony at the Evidence Rule 8 hearing was not offered to establish a standard of care in the *31 industry and a deviation from that standard by Rule and/or Texaco. It was offered instead to prove conduct by inference from the impliedly negligent conduct of others in the oil industry. Evidence of conduct by others in the industry concerning spillage, without first-hand knowledge of Rule's actual practice of filling his underground tanks and serving his customers, simply could not form a basis for a reasonable inference that Rule was negligent just because he was part of that industry.
Plaintiffs also argue that Young could have "identif[ied] sources of discharges at Rule's Texaco station and explained how contaminants from these areas could enter the groundwater," and also "would have also explained the relationship between Rule and Texaco." However, Young did not explain how discharged contaminants could enter the groundwater, nor could he. This was the province of the hydrogeologists. Young did touch on the type of contractual relationship that probably existed between Texaco and Rule. However, he did not even suggest that a duty existed on the part of Texaco to counsel Rule on proper operation which was a predicate to plaintiffs' direct negligence argument against Texaco. Indeed, the testimony on which plaintiffs now rely was brought out on cross-examination when Young stated "the question of control [by Texaco] I don't think is the right approach. The oil company certainly could not tell a property owner what he had to do with his property. We could counsel them." We find no error in barring Young's testimony.
Plaintiffs further argue that the trial judge erred in barring their expert Donald Bello's testimony that, in his experience, gasoline contamination of groundwater caused deterioration of polymer gaskets in the monitoring wells. Plaintiffs whose wells tested negative for contamination presented, as alternative evidence for contamination, histories of rubber washer deterioration. They sought to have Bello testify that in his experience as a hydrogeologist he had observed that deteriorated washers and gaskets in monitoring wells indicated gasoline contamination of groundwater. At an Evidence Rule 8 hearing plaintiffs' counsel *32 argued that the jury could infer from Bello's proffered testimony that plaintiffs' excessive washer and gasket wear evidenced VOCs and contamination.
The trial judge barred the testimony, characterizing it as a "hunch" without factual foundation or scientific basis. The judge ruled that Bello could not testify as to any connection between rubber deterioration and the presence or absence of VOCs in water essentially because such a conclusion was outside the scope of his expertise. We agree.
Bello is a hydrogeologist, and as such, deals with groundwater flow and use. He conceded that he had no knowledge of the composition of the affected pump parts or how they compared with household washers. Nor was he aware of any studies supporting a proposition that gasoline contamination in water degraded rubber plumbing parts. Although he knew of scientific articles reporting destruction of rubber by direct application of gasoline, he did not rely upon the articles. Therefore, Bello's proffered testimony consisted solely of incidental observations he had made in the course of his work as a hydrogeologist, and nothing more. His expertise as a hydrogeologist did not render him particularly suited to interpret the significance of his observations. An expert opinion need not necessarily be limited to the narrowest scope of his expert qualifications, at least in toxic tort litigation. See Landrigan v. Celotex Corp., 127 N.J. 404, 421-22, 605 A.2d 1079 (1992) (ultimate decision as to qualification depends on trial court's assessment of witnesses, qualifications and methodology). However, proffered opinions must be founded on the expert's peculiar knowledge or experience. Nesmith v. Walsh Trucking Co., 123 N.J. 547, 548, 589 A.2d 596 (1991). No such peculiar knowledge or experience concerning the deterioration of gaskets and pump parts was demonstrated here.
Finally, plaintiffs argue that the trial judge erred by barring the testimony of Dr. Clifford Owens, a chemistry professor, as to the result of his experiments showing the deteriorating effect of gasoline and other VOCs on rubber gaskets. At plaintiff's *33 request, Owens had carried out two experiments in order to prove that increased concentrations of VOCs dissolved in water produced increased wear of plumbing seals. After two experiments, he found that VOC soaks caused significantly increased wear in concentrations of 100 parts per billion and above.
Owens acknowledged that his field of expertise, inorganic chemistry, did not include the study of polymers, the materials comprising the washers, and that he had studied no publications in this area. However, he said he had some knowledge of polymer chemistry. He also acknowledged that he resorted to inventing the methodology he used because he believed, based on his own research (and an inquiry from a former colleague) that there was no appropriate approved testing procedure. He also admitted that he had no knowledge of whether the types of washers he used during the tests resembled the washers used in plaintiffs' homes.
Evidence Rule 56(2) (N.J.R.E. 702 to 703), permits consideration by an expert witness of data and information "if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." See also Rubanick v. Witco Chem. Corp., 125 N.J. 421, 447, 593 A.2d 733 (1991). In toxic-tort litigation a scientific theory of causation that has not reached general acceptance may be sufficiently reliable if "based on a sound, adequately-founded scientific methodology involving data and information of a type reasonably relied on by experts in the scientific field." Id. at 449, 593 A.2d 733. The expert must identify the factual bases for his or her conclusions, explain methodology, and demonstrate that both the factual bases and the methodology are reliable. Landrigan, 127 N.J. at 417, 605 A.2d 1079. See also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. ___, ___-___, 113 S.Ct. 2786, 2796-97, 125 L.Ed.2d 469, 482-83 (1993) (federal judges must examine whether the scientific knowledge can be and has been tested, whether it has been submitted to peer review and publication, the error rate of the measuring technique and the level of acceptance in the relevant scientific community).
*34 Even under the relaxed standard applicable to toxic-tort litigation, we are satisfied that the trial judge did not err in excluding Owens' testimony. Owens failed to show that his methodology was scientifically reliable under any relevant test. He conceded that the methodology had never been used by experts in any field, and that he was not familiar with any approved method. His reason for departing from accepted procedures was not to improve on them, but stemmed from his lack of awareness of accepted procedures. Finally, Owens could do no more than surmise that his test samples were representative of the plumbing parts plaintiffs found to be deteriorated. His testimony was therefore properly excluded.

V
Plaintiffs next contend that the trial judge erred by refusing to give a res ipsa loquitur charge, by instructing that strict liability under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -50 (Spill Act), applied only if discharges were found to come from underground tanks, and by instructing that the Texaco station could not be a source of ubiquitous contamination.
Res ipsa loquitur permits an inference of negligence from plaintiff's proofs where (1) the occurrence itself ordinarily bespeaks negligence; (2) the instrumentality causing the injury was within the defendant's exclusive control; and (3) there is no indication in the circumstances that the injury was the result of plaintiff's own voluntary act or negligence. Brown v. Racquet Club, 95 N.J. 280, 288, 471 A.2d 25 (1984); Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 269, 139 A.2d 404 (1958). The "occurrence" of which plaintiffs complain here is the VOC contamination of their wells. It is at least arguable that the first prong of the doctrine was satisfied by plaintiffs because it depends on the balance of probabilities being in favor of negligence. Buckelew, 87 N.J. at 526, 435 A.2d 1150. However, the second and third prongs are not satisfied.
*35 The "exclusive control" (second) prong does not require that a plaintiff "exclude all other possible causes of an accident as a condition of entitlement to the doctrine, provided he can show that it is more probable than not that the defendant's negligence was a proximate cause of the mishap." Brown, 95 N.J. at 291-92, 471 A.2d 25. The evidence must merely afford a rational basis to conclude that defendant's control over the instrumentality was such that some act of negligence on defendant's part was a contributing cause of the resulting accident. Id. at 292, 471 A.2d 25. However, this presumes the instrumentality is known, whereas here the instrumentality of contamination is hotly disputed. As to the third prong, there is at least some indication that the contamination may have resulted from the voluntary acts or neglect of some of the plaintiffs themselves, including the spillage of gallons of waste oil to control weeds, use of oil-based solvents to repair cars, and abandonment of heating oil storage tanks on plaintiffs' properties. Even though the DEP representative ruled out local sources as the cause of contamination, there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect. Res ipsa loquitur was therefore properly not charged to the jury.
The trial judge explained to the jury that the Spill Act imposes strict liability on anyone who owns, possesses or stores petroleum products in underground containers when gasoline escapes into the ground from the containers. The judge, however, charged that liability under the Act is not imposed for above-ground over-fill spills:
Now, in this connection be very careful. I am not talking about above ground spills. We are not talking about what you may have now heard referred to as overspills at the tanks. We are not talking about backsplashes from overfills at the pumps. We are not talking about the drains. The law on strict liability is only as to underground storage. We are not talking about any above ground spills in this section. So this is strictly limited to the vessel or the pipes and if there is a leak. If there is no leak, you're done. If there is a leak, you have to go and continue along with me.
Plaintiffs had requested a charge that strict liability under the Spill Act applied to all discharges and thus objected to any *36 deletions from its proposed instruction request. They now argue that when the judge adopted the Spill Act standard of strict liability, it was error to limit liability only for underground discharge since the Act prohibits any "discharge of hazardous substance." N.J.S.A. 58:10-23.11c. Plaintiffs are correct. Under the Act, "discharge" means any act, whether or not intentional, resulting in releasing of hazardous substances into water or onto land. N.J.S.A. 58:10-23.11b.h. See also State, Dep't of Envtl. Protection v. Arlington Warehouse, 203 N.J. Super. 9, 15, 495 A.2d 882 (App.Div. 1985) (liability imposed under Act for discharge of hazardous substances from warehouse in course of fire).
Texaco asserts that the error was harmless because strict liability under the Spill Act should not have been charged at all. Citing Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 478-79 (D.N.J. 1992), Texaco claims that the Act does not provide a private right of action. See also Jersey City Redevelopment Auth. v. PPG Indus., 655 F. Supp. 1257, 1263 (D.N.J. 1987); Allied Corp. v. Frola, 701 F. Supp. 1084, 1091 (D.N.J. 1988). However, recently, the United States District Court for New Jersey, citing the pertinent 1992 amendments to the Spill Act (L. 1991, c. 372), held that the Act, as amended, "clearly states an intent to provide a cause of action to private plaintiffs" to recover costs of clean-up. Mayor of Rockaway v. Klockner & Klockner, 811 F. Supp. 1039, 1051 (D.N.J. 1993). See also Analytical Measurements v. Keuffel & Esser Co., 843 F. Supp. 920, 929-30 (D.N.J. 1993) (Spill Act, as amended, affords private parties the right of contribution to recover the cost of clean-up and removal of discharge); and see Pitney Bowes v. Baker Indus., 277 N.J. Super. 484, 487-89, 649 A.2d 1325 (App.Div. 1994) (private right of contribution under Spill Act not subject to time-bar under N.J.S.A. 2A:14-1.1).
In any event, the cases cited by both plaintiffs and Texaco pertain solely to the private party's right to recover the costs of clean-up and removal of the contamination, by contribution or otherwise. Here, proofs concerning plaintiffs' damages were not adduced since the case was tried on liability only. However, their *37 complaint demands damages for emotional distress, enhanced risk of disease, loss of enjoyment of their properties and "other economic and financial harm." We do not read the Spill Act as creating a private cause of action for the recovery of such damages. Therefore, the error in the strict liability charge given under the Act was harmless.
Finally, we note that the trial judge held that Rule's operation of the service station was not "an abnormally dangerous situation" under the Restatement of Torts (Second) §§ 519-20 (1976). The abnormally dangerous activity doctrine is premised on the principle that "one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." T & E Indus. v. Safety Light Corp., 123 N.J. 371, 390, 587 A.2d 1249 (1991), (quoting Restatement of Torts (Second) § 519 (1976)). Under the Restatement analysis, "whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration." State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 491, 468 A.2d 150 (1983). See also Restatement, § 520, comment f, which cautions against per se rulings; and see T & E Indus., 123 N.J. at 391, 587 A.2d 1249. The Restatement sets forth six factors to be considered in deciding whether an activity is abnormally dangerous. Restatement, § 520.
Plaintiffs have not challenged on appeal the trial judge's determination that the operation of the service station was not an abnormally dangerous activity. However, they may not have done so because strict liability was charged under the Spill Act. In any event, no analysis or findings were made as to whether the specific operations of the gasoline station created a high degree of risk. See Restatement, § 520(a). The judge did not focus on each of the pertinent factors under the Restatement in determining whether Rule's conduct was an abnormally dangerous activity. Therefore, since there is no basis for strict liability under the Spill Act, the trial judge on remand should specifically apply the Restatement *38 factors to determine whether there is a jury issue concerning strict liability against Rule on the abnormally-dangerous activity theory.

VI
Finally, plaintiffs argue that the trial judge erred in dismissing nuisance claims of the seventeen plaintiffs within a redlined area whose wells were not in the pathway of contamination and did not test positive for contamination. Texaco responds that plaintiffs failed to offer evidence that the redlining, which was the basis for alleging nuisance, constituted foreseeable harm or was due to activities of Texaco or Rule.
In 1985, the DEP identified the gas station as the probable cause of contaminants. Once a cluster of contaminated wells was identified, the DEP redlined an area within which new wells were prohibited. This area included homes whose wells tested negative because the DEP considered them immediately threatened by the groundwater pollution, given their proximity to the polluted wells. Many plaintiffs whose wells tested negative but who lived within the redlined area testified that they stopped using their water for drinking or cooking and some stopped taking showers.
Negligently caused economic loss may be recoverable absent physical harm by an identifiable class of plaintiffs whose damage is reasonable foreseeable. People Express Airlines v. Consolidated Rail Corp., 100 N.J. 246, 263-64, 267, 495 A.2d 107 (1985). Of course, resultant losses must be proximately caused to be compensable. Id. at 264-65, 495 A.2d 107. Such damages would include "those reasonably to have been anticipated in view of the defendants' capacity to have foreseen that this particular plaintiff was within the risk created by their negligence." Id. at 268, 495 A.2d 107. Also, one is subject to liability for private nuisance if he negligently invades another's interest in the private use and enjoyment of his land. Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. 582, 591-92, 449 A.2d 472 (1982).
*39 We agree with plaintiffs that as area residents, they comprised a foreseeable class potentially harmed by any negligent discharge from the gas station, although the harm actually caused by the redlining per se was apparently minimal. Also, plaintiffs did present evidence attributing the well contamination found in some wells to the Rule/Texaco era, and it was the measured contamination, that in turn prompted the redlining. In our view, the nuisance claim against Rule could have been sustained by legitimate inferences from the evidence. We therefore reverse the dismissal of the nuisance claims and remand for further proceedings.
Affirmed in part; reversed and remanded in part.
NOTES
[1] Plaintiff Judith Santucci's application for class-action certification was denied. See R. 4:32-2.
[2] The judge did allow the jury to consider whether Exxon and Ritchie were culpable as to the plaintiffs who settled with these party-defendants. However, these plaintiffs fell within the "Exxon plume."
[3] Kalsch-Forte was named as a defendant in plaintiffs' third amended complaint. However, plaintiffs did not pursue their claim against it. The record does not disclose why the claim against Kalsch-Forte was abandoned.