735 A.2d 576 (1999)
324 N.J. Super. 290
Michael and Melissa M. MERCER, Thomas E. and Sharon A. Guarino, James T. and Frances M. Fox, Thomas G. and Kathy Jo Brodecki, Edmund J. and Patricia M. Decker, Francis X. and Delores M. Murphy, and William M. and Cynthia S. Hartman, Plaintiffs-Respondents/Cross-Appellants,
v.
WEYERHAEUSER COMPANY, and Weyerhaeuser Real Estate Company, Inc., Defendants/Third-Party Plaintiffs, and
Scarborough Corporation and Amberfield Associates, Defendants/Third-Party Plaintiffs-Appellants/Cross-Respondents, and
Capitol Products Corporation, Third-Party Defendant-Respondent, and
Endel Lindepuu and Ten Gir Corporation, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 1999.
Decided July 13, 1999.
*577 Ann C. Singer, Westmont, for defendants/third-party plaintiffs-appellants/cross-respondents Scarborough Corporation and Amberfield Associates (Earp *578 Cohn & Pendery, attorneys; Ms. Singer and Samantha Pettine, on the brief)
Carlo Scaramella, Cherry Hill, for plaintiffs-respondents/cross-appellants Mercer, Guarino, Fox and Murphy (Hunt & Scaramella, attorneys; Mr. Scaramella, H. Thomas Hunt III and Anthony L. Marchetti, Jr., on the joint brief).
Thomas J. Vesper, West Atlantic City, for plaintiffs-respondents/cross-appellants Brodecki, Decker and Hartman (Westmoreland, Vesper & Schwartz, attorneys; Mr. Vesper and Michele Trageser, on the joint brief).
Michele M. Fox, Cherry Hill, for third-party defendant-respondent Capitol Products Corporation (Kenney & Kearney, attorneys; Ms. Fox, on the brief).
Before Judges LONG, KESTIN and CARCHMAN.
The opinion of the court was delivered by LONG, P.J.A.D.
On October 13, 1993, plaintiffs Michael and Melissa M. Mercer, Thomas E. and Sharon A. Guarino, James T. and Frances M. Fox, Thomas G. and Kathy Jo Brodecki, Edmund J. and Patricia M. Decker, Francis X. and Delores M. Murphy, and William M. and Cynthia S. Hartman filed a four-count complaint against defendants Weyerhaeuser Company, Weyerhaeuser Real Estate Company, Inc. (WRECO), Scarborough Corporation, Amberfield Associates and three fictitiously named corporations seeking damages which they allegedly incurred as a result of the selection and installation of Capitol Products Corporation aluminum windows in their new homes constructed by Scarborough and Amberfield.
The complaint alleged negligent selection of Capitol aluminum windows and doors for plaintiffs' homes (Count One); negligent installation of those windows and doors (Count Two); consumer fraud (Count Three); and negligent misrepresentation as to the quality of the windows and doors, as well as the quality of their installation (Count Four).
After considerable procedural maneuvering, the details of which need not be related here, WRECO and Weyerhaeuser were granted summary judgment and the case went to trial against Scarborough and Amberfield solely on the consumer fraud claim.[1] The seventeen-day trial centered on representations allegedly made to plaintiffs by Scarborough's salesman William Kryzk[2] (denied by him) that Capitol windows are "as good as Andersen windows" and are "thermal break windows."[3] Plaintiffs claimed these statements were made during the option selection process, after they had signed contracts to purchase their respective homes from Scarborough. Andersen windows, which are wood-framed windows, were offered as an upgrade for a substantial additional cost in lieu of Capitol's aluminum framed windows which were the Amberfield standard at the time.
The issues at trial were, first, whether the statements as to the relative quality of Capitol versus Andersen windows were indeed made to plaintiffs and, second, whether these statements were in fact false or misleading within the contemplation of the Consumer Fraud Act which provides in pertinent part *579 [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

[N.J.S.A. 56:8-2.]
In the event that the jury answered the above questions affirmatively, defendants sought to demonstrate that plaintiffs sustained no ascertainable loss.
It is not necessary to set forth the facts in detail for the purpose of this opinion other than to say that the jury was presented with sharply differing versions of what transpired between plaintiffs and defendants. Plaintiffs all testified that Krzyk told them that Capitol windows were as good if not better than Andersen and that they were "thermal break windows." Kryzk denied saying that Capitol windows were as good as Andersen windows, but admitted telling plaintiffs that Capitol windows were thermal break windows. It was his understanding that the Capitol windows had a thermal break in the sash.
The parties' experts also disagreed. Plaintiffs' experts essentially concluded that Capitol windows were not thermal break windows and that they were not as good as Andersen windows. As might be expected, the defense expert stated that the Capitol window was a thermal break window and was as efficient as an Andersen window.
The jury returned a verdict in plaintiffs' favor awarding compensatory damages in the amount of $146,350, which when trebled by the court, under N.J.S.A. 56:8-9, amounted to $439,050. The judge entered partial summary judgment in that amount by an order dated April 7, 1997, and directed plaintiffs to apply for prejudgment interest, counsel fees, and costs within thirty days of the March 19, 1997, jury verdict.
By motion dated March 31, 1997, defendants sought judgment notwithstanding the verdict or, in the alternative, a new trial. The motion was denied. However, defendants were deemed entitled to a credit equal to the net amount that plaintiffs received from an earlier settlement with the installers of the windows.
On April 18, 1997, plaintiffs moved for counsel fees and costs in the amount of $1,120,265.82, and prejudgment interest in the amount of $22,417.62. The judge awarded plaintiffs counsel fees totalling $725,952.50.
More procedural maneuvering occurred including a motion for stay which was denied by the trial judge and later granted by us on July 1, 1997, and a supplemental motion by plaintiffs for counsel fees which was granted in the amount of $38,612.15.
Defendants now appeal, claiming that the trial judge's hostility toward them, their witnesses and counsel deprived them of a fair trial; that numerous trial errors, from dismissals and evidential rulings to the jury instructions, require reversal; that they are entitled to remittitur; that prejudgment interest should not have been awarded; and that the counsel fees awarded to plaintiffs are excessive.
On their cross-appeal, plaintiffs contend that defendants should not have received the settlement credit; that Weyerhaeuser and WRECO were not entitled to summary judgment; and that the attorney's fees awarded were inadequate.
We have carefully reviewed this record, including the transcripts of the entire trial along with the videotaped portions submitted by defendants. We determine that defendants were denied a fair trial by the judge's hostile treatment of their counsel *580 and witnesses in the presence of the jury and that the verdict against them cannot stand.

I
The Code of Judicial Conduct, Canon 3A(3), requires that a judge "be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity...." James v. City of East Orange, 246 N.J.Super. 554, 564, 588 A.2d 412 (App.Div.1991). A judge must conduct a trial in a fair and impartial manner, refraining from remarks that might prejudice a party or might influence the minds of the jury. Cestero v. Ferrara, 110 N.J.Super. 264, 273, 265 A.2d 387 (App. Div.1970), aff'd, 57 N.J. 497, 273 A.2d 761 (1971).
We set out the most direct statement as to the standard of conduct expected of a trial judge in State v. Zwillman, 112 N.J.Super. 6, 20-2l, 270 A.2d 284 (App. Div.1970), certif. denied, 57 N.J. 603, 274 A.2d 56 (1971):
Great latitude is given to a trial judge in the conduct of a trial. There are, however, bounds within which he must stay. A trial judge may intervene in the trial during the introduction of evidence to qualify or expedite matters. The trial judge is the symbol of experience, wisdom and impartiality to the jury and, as such, must take great care that an expression of opinion on the evidence should not be given so as to mislead the jury. He must not throw his judicial weight on one side or the other.
It is not proper for a trial judge to indicate his belief or disbelief of a witness, for to do so would be a usurpation of a duty solely within the province of the jury.
A trial judge should never unfairly criticize or humiliate defense counsel or a defense witness. Where it appears that the trial judge has turned the jury against the defendant by mistreating defendant's counsel in front of the jury, a new trial is required. Canons 5 and 10 of Canons of Judicial Ethics make it clear that trial judges must be courteous to counsel and be temperate, attentive, patient and impartial. A judge's failure to comply with these canons can easily prejudice a jury since it conveys the opinion of the judge as to his belief or disbelief in one side of the case. Attorneys are as much a part of the judicial system as judges. Without the active cooperation of attorneys our system of justice will come to a grinding halt. To demean an attorney, particularly in front of a jury, is completely unacceptable. It not only prejudices the litigant, but it goes to discourage lawyers from becoming trial attorneys. If we do not have an adequate number of lawyers willing to be trial attorneys, the judicial system as we know it will not survive. (Citations omitted).
In Zwillman, we prefaced our declaration with the observation that prejudicial conduct by a trial judge is properly reviewable by an appellate court "considering the entire transcript," and that harmless error is not to be found simply because the appellate court may believe that the defendant was guilty as charged. Id. at 20, 270 A.2d 284. Although Zwillman is a criminal case, we see no reason why the same standard should not apply in a civil case. In other words, the fact that this verdict could be sustained does not mean that it should be sustained.
In Zwillman, we concluded that the conduct of the trial judge toward defense counsel "tended strongly to prejudice the defendant in the eyes of the jury." While no single instance may have been sufficient to warrant a reversal, we determined that in the aggregate, the actions of the trial judge deprived the defendant of a fair trial. Ibid. In our view, the same observation can be made about the trial judge's conduct in this case.
The tone of the trial judge's interaction with defense counsel was set during a colloquy *581 concerning an earlier pretrial motion. The judge asked about the motion, which had been heard by a different judge. When defense counsel was slow in responding with the name of the judge, he told her to "forget it." Defense counsel apparently did not understand this directive and continued explaining that the motion was denied, relating the basis for the denial. The judge immediately became annoyed, breaking in on her response, questioning "what's bringing all this chatter forth?" Inquiring sarcastically (and this is clear from the videotape) whether he had asked her a question, he continued, directing that she "please learn something." He instructed that when she was in his courtroom and was asked a question, she was to answer it and then "that's the end of the discussion.... If I want to hear more, please, I'll ask you. Do you understand that?" After defense counsel indicated in the affirmative, the judge continued:
That's very important, very critical, because we don't do sidebars. Notwithstanding the window case ... in which they suggested that perhaps that wasn't the appropriate procedure.[4] The suggestions I don't follow; orders and directives I do. So we don't do sidebars. And, therefore, when I ask a question, I expect the question to be answered directly, forthright, candidly and honestly, without equivocation. But nothing else, understand? ... Because the jury's going to be sitting here and I don't want you to get the idea that hey, here's a great chance to get a lot of material before the jury that I couldn't do if we were at sidebar.... The only reason I'm making a point of this is because you've apparently never worked before me before, and you're not familiar with my style.
Unfortunately, while the trial judge insisted on hearing nothing more than a simple answer to his questions in order to prevent extraneous and inappropriate material from reaching the jury, he did not abide by that rule himself. Indeed, the trial record is replete with gratuitous comments by the judge which redounded to the detriment of defense counsel and her clients.
Defense counsel's next problem with the trial judge arose during her opening statement. She introduced to the jury Rick McMichael (who was a representative of Scarborough) who was sitting at counsel table. Defense counsel had barely mentioned the name when the judge broke in, sua sponte, commenting, "I did that when we did voir dire, please." Moments later, counsel was in the process of telling the jury that her opening had a four-pronged but simple theme because "this is actually a very simple case." When she commented that Scarborough had not brought into court "blown-up exhibits" or "glossy photographs," plaintiffs' counsel objected. The judge sustained the objection asserting that that kind of statement was argument and directing that defense counsel "keep it to what you propose to prove." After defense counsel indicated that she would, the judge added, "you don't attack or criticize your adversary in an opening statement." This comment was unwarranted; the judge had already explained why the objection was proper, and he ascribed what appears to us to be an unfounded characterization to a simple and only arguably improper statement about trial exhibits.
*582 Likewise, in many instances, in sustaining plaintiffs' counsels' objections, the judge went far beyond what was required and lectured defense counsel about the rules of evidence, creating the unmistakable impression that defense counsel simply did not know what she was doing or, worse, was deliberately flouting the judge's rulings in an attempt to get improper material before the jury.
For example, when defense counsel showed a document to plaintiff Thomas Guarino and asked if it was the sales agreement that he had signed, he responded that it appeared to be. Defense counsel then made the mistake of verbally acknowledging the judge's earlier ruling that the sales agreements would not go into evidence. Instead of acknowledging that her understanding of his ruling was correct, the judge stated:
Well if you understand it why are you bringing it up in front of the jury, Counselor? I previously made a determination, I made a ruling and now what you're trying to do is bring up in front of the jury an issue that is not properly brought before them. Don't do it again.
On another occasion, defense counsel was cross-examining plaintiff William Hartman about whether he ever mentioned to a Scarborough representative that the condensation on the windows was bothering him. When he indicated that he did not remember, counsel asked if he recalled testifying at his deposition that he had never complained to Scarborough about the condensation. Hartman professed not to remember. She showed him a page from his deposition and asked if he would silently read certain lines. The witness agreed that what he read "says basically what I said." Counsel then asked if it refreshed his recollection that he never reported condensation problems to Scarborough.
Hartman disagreed, claiming that was not what his deposition said; plaintiffs' counsel objected, also asserting that that was not how the testimony read. Instead of simply sustaining the objection, the judge launched into another evidence rules speech, complete with reference to counsel's violation of them:
Just a minute. The witness just got done saying that, Counselor, no, that's not what it reads. That's what the witness said. Now, you see what you've done is you've taken a document and allegedly used for refreshing recollection and as I told you yesterday, anything can be used to refresh the recollection of a witness as Cardozo said, even the smell of a rose. But you do not identify it before the jury. You don't read it before the jury. You show it to the witness, take it away and question the witness on the refreshed recollection. You just violated all those rules.
And we're at a point now where somebody says that what you were representing to the jury isn't even what was on the document.
Defense counsel asked permission to rephrase the question. She was attempting to ask her question when plaintiffs' counsel interrupted, asking for "an instruction now, not later, with all due respect. A representation has been made." The judge agreed and asked defense counsel if she was going to "clear it up ... or aren't you." She said that she would, and wanted to show plaintiff a different line, a few lines down the page. The judge responded: "No, no, no, read it. Let's clear it up right now. Because you read something to the jury or suggested something ... which you shouldn't have done, number one. And it's now been alleged that what you said wasn't even accurate ... so that's another violation, number two." Shortly thereafter, the judge gave the jury a "curative" instruction, reminding them that
[n]one of the rulings that I make, nothing that I do or say is to be taken as any indication as to how I feel the case should be decided. I'm not trying to help anybody or hurt anybody. I'm just trying to see to it that the matter does progress in accordance with the accepted *583 rules promulgated by our Supreme Court and matters of that nature.
Again, during Frances Fox's cross-examination, plaintiffs' counsel objected to defense counsel's use of a certain document. Although the judge "sustained" the objection, he did not stop there. He chastised defense counsel:
You didn't use it properly under Evidence Rule 803(c)(5). I've been over that with you numerous times. We're not going to deal with it again. The objection is sustained. The witness testified that she did not have adidn't know if the model had Beagle windowsBeagle had Andersen windows or not. That's it. This document is not dealt with on cross-examon direct examination. It's beyond the scope of direct examination. There are reasonable inferences to be drawn therefrom. You didn't deal with it under 803(c)(5). You didn't deal with it under 6-12A [sic] so the objection is sustained. Let's move on.
Defense counsel then asked Fox "to look at D-40" (the document) to see if it refreshed her recollection. Counsel was not permitted to finish her question to specify which of Fox's recollections she was referring to because the judge broke in and the following exchange took place:
THE COURT: You're not supposed to identify the document, and you're not supposed to make known to the witness the content of the document. When you're refreshing recollection you merely show the document to the witness and ask the witness if, in fact, it refreshes their recollection with respect to the matter under discussion Now, having looked at it, does it refresh your recollection?
MS. FOX: It's my signature, but I don't
DEFENSE COUNSEL:Would you read it and tell me if it refreshes
THE COURT: She said it's my signature, but I don't and you cut her off. Take it away. It has not refreshed her recollection. Let's move on.
MS. FOX: It's not something that I dealt with on a consistent basis.
DEFENSE COUNSEL: What isn't something you dealt with on a consistent basis?
PLAINTIFFS' COUNSEL: I'd object. She'sobjection.
THE COURT: I would suggest, counselor that when I sustain an objection you listen to what I say and be bound by it. Acceptable?
DEFENSE COUNSEL: Yes. Absolutely acceptable, Your Honor.
About sixty transcript pages later, the judge allowed defense counsel to recall Fox to question her about that document because he had been wrong about counsel's ability to use it. He explained to the jury why that witness was back on the stand. The document was an acknowledgement by Fox that she had visited Scarborough's Montclair model (which she eventually purchased in Amberfield) in the Beagle Club development, and was aware that it contained Andersen windows as well as other options which were not standard in the home she was having built in Amberfield. Unfortunately, in questioning the witness, defense counsel misspoke and asked her whether, by signing that document, she acknowledged that the Montclair model which she visited "at Amberfield" (instead of the Beagle Club) had Andersen windows. Plaintiffs' counsel immediately objected and the trial judge again rebuked defense counsel:
THE COURT: Sustained. That's not what I told you.
DEFENSE COUNSEL: I
THE COURT: You just did it all wrong. You said Amberfield.
DEFENSE COUNSEL: Well
THE COURT: This is Beagle Club.
DEFENSE COUNSEL: I'm sorry.
THE COURT: We must have spent 20 minutes on this *584 DEFENSE COUNSEL: I'm sorry.
THE COURT:and you screwed it up. One question.
DEFENSE COUNSEL: I meantI did screw it up and I am sorry. It wasn't
THE COURT: Let's try it again.
DEFENSE COUNSEL: Yes.
THE COURT: Wait a minute. Let me do it. I haven't done this for 16 every once in a while I like to get back in the action.
To complete the humiliation of defense counsel, the judge took over the examination of Fox about the document, elicited the information sought by defense counsel, and then commented to all in the courtroom that he was not "trying to help anybody. I'm just trying to get the job done." The judge's immediate "curative" instruction to the jury that "it doesn't have any indication as to how I feel the case should be decided or not decided or anything else" and his admission that he "exaggerated when I said 20 minutes" and "made counselor look bad," could not have done anything to erase the unmistakable message of counsel's incompetence conveyed by the judge's comments and conduct.
The judge demonstrated to the jury that he could be equally unpleasant when caught by defense counsel making a misstatement of his own. This occurred during plaintiff Hartman's direct examination when defense counsel objected to plaintiffs' counsel's reference to Scarborough's being a subsidiary of Weyerhaeuser, asking whether that influenced Hartman's purchase of the home. Defense counsel asserted that Weyerhaeuser had nothing to do with the case and thus the question was not relevant. The judge corrected her, saying that plaintiffs' counsel "just asked Scarborough. He didn't say a word about Weyerhaeuser." Plaintiffs' counsel, in turn, corrected the judge, saying that "I did just ask him," and the judge responded: "Scarborough, Weyerhaeuser, it's all one ball of wax. We're just agreeing to call it Scarborough, its Weyerhaeuser, its Amberfield, its everybody packaged together." When defense counsel registered her dissatisfaction with that explanation because "Weyerhaeuser Company was dismissed from this case, so we're really not talking about them at all. We're just only talking about Scarborough," the judge became annoyed and sarcastic, responding: "Then you just keep going with Weyerhaeuser and we won't have any stipulation and we'll get all involved in a lot of complicated material. Isn'tdoesn't it really make no difference at all. We're talking about Scarborough." Defense counsel immediately backed off, but the judge essentially forced her to agree that it didn't make any difference, when it could have, if the jury got the notion there was an even deeper pocket involved here than that represented by Scarborough. Nevertheless, the worst part of that exchange was that the jury had been given the impression that defense counsel was making an issue over nothing, and possibly forcing the trial to become unnecessarily involved in "complicated material."
As troubling as these described incidents are, seven other confrontations between defense counsel and the judge, in our opinion, were even more prejudicial. The first incident occurred during cross-examination of plaintiff Thomas Brodecki when defense counsel asked if he recalled giving a certain answer at his deposition which answer she was about to read. Plaintiffs' counsel interjected, asking that she read another section of the deposition at the same time, which defense counsel was not inclined to do. The judge asked defense counsel to let him see the portion of the deposition to which they were referring. Apparently counsel was searching the deposition pages to find the lines at issue. The judge was impatient and asked her several times to let him see the printed pages when the following took place:
THE COURT: Just let me see it please.
DEFENSE COUNSEL: I'm sorry, I'm just looking at the lines.
*585 THE COURT: Let me see it.
DEFENSE COUNSEL: Sorry.
THE COURT: I have this problem with you every time. Why don't you 
DEFENSE COUNSEL: I'm sorry, I just want
THE COURT:want to let me see it?
DEFENSE COUNSEL:to be helpful. I just want to
THE COURT: Don't be helpful. I can deal with it.
DEFENSE COUNSEL: I'm sorry.
THE COURT: I like to look, that's all. I know you're trying to be sweet and adorable and lovable and everything else, because I'm a soft-spoken easy-going mild mannered old man, but don't do me any favors, okay?
DEFENSE COUNSEL: I was just trying to be helpful actually.
Characterizing these comments as inappropriate is a gross understatement.
Two trial days later, during defense counsel's direct examination of Carol Capone, a Scarborough employee, plaintiffs objected to Capone's being asked whether neighboring developments were comparable to Amberfield in price range. The judge overruled the objection until Capone responded that she "never really went into price, but style and type of home and community appeared to be similar." At that point, the judge sustained the objection, indicating that the style and the type of community were not relevant. The only thing relevant was price because plaintiffs made an issue of price.
Defense counsel then asked if these developments were upscale communities. The judge broke in and began to scold defense counsel, comparing her unfavorably with plaintiffs' counsel:
I just saiddidn'twait a minute. We better get ourselves straight here. We're going to be conducting a lot of examinations of witnesses, and when I make a ruling I expect the attorney to follow the ruling. I don't want to have to keep doing it over and over again. Do you understand what I said? Did you notice how [plaintiffs' counsel] did it? When I ruled that was the end of it. You do the same thing, okay? ...
DEFENSE COUNSEL: I understand, Your Honor.
THE COURT: Well then if you do don't do it anymore. I don't want to have to deal with this one more time.
A few minutes later, the judge instructed the jury that "the mere fact that I reminded [defense counsel] that that's what I expected is not to be taken as any indication that I'm not happy with her, that I feel how the case should be decided or anything else. I just want to make sure that everybody understands the ground rules, that's all."
The next incident occurred during the direct examination of Scarborough's president, Winfield Ziegenfuss, when defense counsel attempted to determine the amount of profit Scarborough made on the sale of the Andersen window option as compared to that made on the sale of the Capitol windows. Not without some difficulty, defense counsel was able to elicit from Ziegenfuss that there was more profit in the sale of the Andersen package. He explained that the cost of installing the two types of windows was the same, although with the Andersen windows there was some additional cost for trim and painting, as well as material. He stated that the typical markup was a minimum of twenty-five to thirty percent (indicating, inferentially at least, that different products had different markups).
Plaintiffs' counsel objected to Ziegenfuss talking about probabilities as opposed to testifying from actual knowledge, and the judge sustained the objection, indicating that Ziegenfuss was the president of the company and he either knew or did not know what the markup was; if he was estimating, defense counsel had to qualify him as an expert. Defense counsel asked Ziegenfuss if his "guess" or "estimate" was based on his personal knowledge as president. *586 The judge sustained plaintiffs' objection, repeating that Ziegenfuss either knew or did not know, but that he would have to be qualified as an expert to express an opinion. Defense counsel then asked whether the markup on the Andersen windows more than compensated for the additional cost attributable to them. Without an objection from plaintiffs the judge interjected "sustained" on the ground that "that is obviously an expert opinion, and he hasn't been named as an expert I'm told." Defense counsel disagreed, asserting that that was a factual question because Ziegenfuss "knows what he got." The judge told her to "forget it. It's not a factualit's an opinion." Defense counsel then rephrased her question and the following ensued:
DEFENSE COUNSEL: As a fact, Mr. Ziegenfuss, did the markup more than compensate for the increased cost of the window and the increased cost of installationinstalling the trim?
PLAINTIFFS' COUNSEL: You can call a fact
THE COURT: I know. I'm going to let him do it, because I know what's going to happen as we go through this. I've been doing this job more than two weeks. Answer the question. Do you know it as a fact, sir?
MR. ZIEGENFUSS: Yes sir, I do.
THE COURT: Fine. And what is the markup over the additional costthe number?
MR. ZIEGENFUSS: The number, minimum of 25 percent
THE COURT: Sustained.
PLAINTIFFS' COUNSEL: I'd ask that
THE COURT: Sustained. Disregard the answer of the witness. I see the jury is all shaking their heads. They know better than the counselor does what the rules are. The minute he says it's a minimum he's expressing an opinion. It's not a fact. Proceed.
It is certainly demeaning to a lawyer to suggest that the jury knows the evidence rules and trial procedure better than she does. Any negative opinion the jury may have had of defense counsel and her witness at this point in the trial was reinforced by the judge's interaction with the jury.
This negative opinion was bolstered by the judge shortly thereafter, while Ziegenfuss was still on the stand. Defense counsel complained that every question she asked of him was being interrupted, to which the judge responded, "[w]ell now that's not a proper comment for you to make either, because many, many, many, many of the questions you're asking were improper and, therefore, it's proper to object to improper questions so let's just do it right and you won't have objections. Alright." At the end of that trial day, the judge again gave his familiar "curative" instruction, reminding the jury
[t]hat nothing that I do or say, no rulings that I make, no comments that I make, no inflection in my voice, nothing is to be taken as any indication as to how the case should be decided. I make my call as I see it. And, I try to explain to you some of the basis of the reasons for it so that you'll understand what we're all about.
As this so-called curative instruction was repeated, its insincerity was underscored.[5] Indeed, the repetitive nature of these instructions, coupled with the repetitive displays of judicial disapproval and displeasure with defense counsel canceled completely any "curative" aspect of the charge.
The trial judge interacted with the jury again during the direct examination of John Boyle, the owner of a construction company, when, in response to an objection by plaintiffs' counsel, he directed *587 that Boyle "will not testify as to the quality of the window, in any way, shape or form, because he's not named as an expert in the area of quality. He's named as a fact witness who will testify factually as to the extent of the sale of the window." Defense counsel then asked whether Boyle marketed the Capitol window as a "top of the line window" between 1988 and 1990. This drew an objection and a question from the court as to whether counsel thought that the term "top of the line suggests quality." When she agreed that it did, the judge began an excruciating exchange with her.
THE COURT: Well, didn't I just sustain an objection and say the witness was not going to be permitted to testify as to quality? Didn't I just say that? Did I?
MS. SINGER: I believe you did ... I believe
THE COURT:did I say it?
MS. SINGER: I believe you did.
THE COURT: Well, what do you mean you believe? Is there something about what I said that you didn't understand?
MS. SINGER: No.
THE COURT: Well then what do you say you believe I did? Did I or didn't I?
MS. SINGER: You did.
THE COURT: Fine. Then why would you on the very next question ask a question that relates to quality? Why would you do that if you understood what I said?
MS. SINGER: I will go ahead
THE COURT: Don't just smile at me. Answer my question.
MS. SINGER: I'm trying to elicit
THE COURT: I didn't ask you what you're trying to do. I asked you why you would go ahead and ask a question that was directly contrary to a ruling I just made.
MS. SINGER: I did not understand that it was directly contrary, Your Honor.
THE COURT: Well, okay, so you didn't understand it. If that's what you tell me so be it. Don't deal in quality directly or inferentially, is that
MS. SINGER: Okay.
THE COURT: You can ask the witness the extent to which windows were marketed in the areathe representation you made in writing. That's what discovery is all about. That's why we have rules of discovery.
MS. SINGER: Your Honor, at the time those interrogatory answers were written
THE COURT: There will be no further discussion. Members of the jury, it's very, very important, because I express some displeasure that the mere fact that I was displeased has nothing to do with how the case should be decided.
This exchange can only be described as painful to watch on the videotape.
Defense counsel returned to her questions, asking Boyle to whom he sold the Capitol E-800 window between 1988 and 1990 and, after he responded, "many builders," asked him to name some of them. She then asked whether he considered those named "to be reputable builders." Plaintiffs' counsel objected, Boyle responded "excellent builders," plaintiffs' counsel objected again, and the court gratuitously commented: "The jury's even smiling." When defense counsel started to continue her questioning the court stopped her, saying
[j]ust a minute. Don't you hear there's an objection? I'm just looking at the jury to see if they understand what you did. You didn't ask whether the window was quality, what you said was are they top of the line builders. In other words, the inference being top of the line builders would have used quality windows. Right?
DEFENSE COUNSEL: Right.
THE COURT: Of course it was.
DEFENSE COUNSEL: I didn't use the term *588 THE COURT: Forget it. It isthe objection is sustained. And, I don't even have to tell the jury the next line, because they're all smiling. Disregard it. Because when you are not permitted to ask whether the window is quality or not, isn't it the same thing to say was the builder quality. The inference being builders wouldn't usethe quality builder wouldn't use a bad window. Same thing. They're all shaking their heads and smiling.
The following day, the judge again suggested that the jurors understood his evidential rulings while defense counsel did not. This occurred during the direct examination of the defense expert, Earl Nolte. Defense counsel attempted to elicit from him the basis of his opinion that some of the windows were "out of square" and that the remedy was to remove and reinstall them properly. According to the trial judge, this type of testimony was improper because nowhere in Nolte's report did he proffer an opinion that the windows had to be reinstalled because the initial installation was defective, or that the windows were not of the appropriate quality. According to the judge, the only information in Nolte's expert report was that he determined that the windows were "out of square" because he took measurements to that effect; it was Nolte's opinion that fixing the windows required them to be reinstalled "and that's it."
Defense counsel indicated that she would not ask the witness any more questions about that, saying, "at least I will try not to, I do not understand Your Honor's ruling." The judge then turned to the jury and instructed them that the dialogue that he just had with defense counsel involved talking about the rules of evidence, rules of practice, reports and discovery obligations, all of which have "nothing to do with the merits of the case, it has absolutely nothing to do with how I feel the case should be decided." The judge continued, essentially telling the jury that because plaintiffs agreed with him he was right:
Apparently there is a difference of opinion between [defense counsel] and the Court as to what the law is in particular areas, and that may be. I would suggest that perhaps the other side agrees with me and if you can get 50/50 you bat.500 you go to the hall of fame every time. It's when nobody agrees with you you're in trouble. And if everybody agrees with you you're suspect because not everybody can ever agree with you all the time.
So, I want you to understand that, it has nothing whatever to do with how the case should be decided, it couldn't nothing could be further from the fact.
Direct examination proceeded, with the judge first acquiescing in plaintiffs' request that Nolte's "last remarks" be stricken, that is, testimony that problems with the windows were caused by installation, and the jury was so instructed. Defense counsel then asked Nolte whether he, "as an expert in remodeling and construction recommend[ed] removing and reinstalling the window to correct the problem if [he] thought the source of the problem was other than installation." Plaintiffs objected and the judge responded: "Okay, sustained. Now she's just trying to do indirectly exactly what I said you couldn't do directly and one, two, three, five of the jurors are smiling and shaking their heads." Again, the trial judge told the jury that they were smarter than defense counsel because they understood his ruling, but she did not.
Later, the judge sustained plaintiffs' objection and, referring to defense counsel, stated "Oh, there she is, I'm looking at her and nothing's registering. Boy, it's not a good day."
The next incident occurred during the cross-examination of a crucial witness to the defense, Scarborough salesman William Krzyk. Plaintiffs' counsel asked Krzyk whether he told prospective homeowners, when they asked about what the *589 type of windows they were going to get, that the windows were thermal break windows. Krzyk responded that "that would be very obvious," because it was in their brochures. Plaintiffs' counsel asked him to answer the question directly, and Krzyk responded that he had no specific knowledge. Plaintiffs' counsel then asked him to listen to the question which he had not asked yet. Defense counsel objected, saying that Krzyk was trying to answer. The judge told her to "just relax," saying further that she was told before to merely say "objection," which the court would deal with and would ask her for her participation if he wanted "to hear from [her]." The judge then commented that "this witness has been asked the same question three different times and he's avoided the answer three different times." Defense counsel attempted to respond but the judge broke in again, saying "he has not answered the question did he discuss with the customers the term thermal break." Defense counsel tried to respond that Krzyk was attempting to answer the question when the court intervened saying, "and he has not answered it. He has avoided it." Defense counsel's protest that Krzyk was "attempting to do that" brought forth this retort:
No, he hasn't attempted to do it either. Now, if you want to argue with me I will say things you'll be sorry that I said, because this witness has been evasive, and he has tried to avoid answering a very simple, direct question. He could either say yes, he could say no or he could say I don't remember. He hasn't said one of the three.
The judge then turned to the jury, reiterating one of his curative charges to the effect that
[t]he mere fact that I have said what I said in the way in which I said it is not to be taken as any indication as to how I feel the case should be decided, but if the lawyer wants to argue with me and wants to make me look wrong I have a right to give my reasons why I rule the way I do. And, I purposely try to avoid that, because I don't want to give my reasons, but if I have to I will.
Clearly, if the judge was purposely trying to avoid giving his reasons, he would not have prohibited sidebars and all of this would not have taken place in the jury's presence. Accusing a party's prime witness, before the jury, of being evasive and of not answering questions was clearly prejudicial. This is particularly so because this case turned, in large part, on credibility. It was a pitched battle between Krzyk and plaintiffs as to what was said and how Kryzk represented or misrepresented the quality of the Capitol windows. Comments such as these were effectively the death knell for defendants' case, if the judge had not already fatally poisoned the defendants' prospects for a favorable jury verdict.
Finally, during the course of defense counsel's summation, plaintiffs objected to her comment that she hoped the jury would not penalize Scarborough for offering the Andersen upgrades to plaintiffs. Although the judge overruled the objection, he commented that "if she wants to make that argument, fine. They had no duty to offer it." Plaintiffs' counsel continued with his objection, saying "they're not being penalized here, either, Your Honor." The judge responded: "Well, I know that. And I'll let her go, because then I'll deal with it in my charge." The judge instructed defense counsel to "proceed. And stop laughing and shaking your head. Now let's finish up. This is about three hours, and I think you've overstayed your welcome." Understandably, defense counsel immediately concluded her summation.
In our view, the judge acted in a way which telegraphed to the jury that he had little respect for defense counsel's legal acumen and trial skills. For example, he called her uncooperative because she resisted interrupting her case to allow plaintiffs' to put on a rebuttal witness, yet her position was clearly understandable because the rebuttal was obviously going to *590 be damaging to her case. He repeatedly castigated her for making "speaking objections," that is, reciting the grounds for her objection after being told not to. And then, out of the presence of the jury, the judge told her that
[y]ou know, what you do when arguing with me is invite my comments in front of the jury which may sometimes not make you look too good but that isn't anything that I do because ... you bring it up and then that forces me to deal with it and I just want you to understand that.
It apparently never occurred to the judge that if he allowed sidebar conferences at trial, such exhibitions before the jury would not happen.
In any event, the truth about his feelings for defense counsel and her courtroom skills came tumbling out, luckily outside the presence of the jury, with the following judicial observation:
Yes, well let me make my statements. I agree with [plaintiffs' counsel], I don't like to sit here constantly sustaining objections because you [defense counsel] don't understand the rules of evidence, in my opinion, and you don't understand how to prove a proper case, in my opinion, and you don't understand Skibinski v. Smith, [206 N.J.Super. 349, 502 A.2d 1154 (1985)] in my opinion, and it puts me in a very, very, very awkward position.
Because, you see, during the plaintiffs' case there were not extensive problems concerning evidential matters, now concerning your case there are horrendous problems concerning evidential matters and in my humble opinion it's because you don't know how to do it right. But it puts me in the position where I'm constantly sustaining objections and that makes it look like somehow I'm against you and for them.
He then explained that as a result, he gave repetitive "curative" instructions to the jury even though "that's exactly what I don't like to have to do but I don't have the choice." Obviously, his choices were foreclosed by his total prohibition of sidebar conferences. In any event, the judge's personal opinion of defense counsel's legal talents should have played no part in his treatment of her before the jury, but it likely did.
In fact, nearly all of the clearly prejudicial remarks made by the judge could have been avoided had those exchanges taken place at sidebar, out of the hearing of the jury. Moreover, our impression is that defense counsel was not deliberately baiting this trial judge, and that any mistakes she made with respect to evidence and the presentation of her case were borne out of her interpretation, right or wrong, of evidence rules and trial procedure. In any event, nothing she did was an excuse for the judge to castigate her before this jury, to unfavorably compare her to plaintiffs' counsel in the presence of the jury, to create the impression that she did not know what she was doing.
This is not the first time that this judge's trial "procedures," particularly his sidebar ban, have been challenged on appeal. In addition to Anaya, supra, referred to in footnote 4, in Priolo v. Compacker, Inc., 321 N.J.Super. 21, 728 A.2d 239 (App.Div.1999), we held that, because his sidebar ban facilitated the improper admission of evidence of the plaintiff's negligence, the plaintiff was irreparably prejudiced despite a curative instruction, and a new trial was required. The absolute sidebar prohibition was deemed an inappropriate exercise of discretion under the circumstances. Id. at 30, 728 A.2d 239.
This case differs from Priolo, because it does not involve the admission of inadmissible evidence or at least defendants' do not so allege. The error here is at once more subtle and more insidious because the sidebar ban permitted the jury to hear the judge's intemperate rebukes of defense counsel again and again, which called into question her legal ability, knowledge and skill, and which in turn reflected badly on *591 her clients. Worse, were the judge's asides to the jury to the effect that they knew more about, and understood better than defense counsel, the judge's legal rulings in the case. These asides, too, were the product of judicial colloquy and directions which, if made at sidebar, would have elicited no reaction from the jury upon which the judge could comment.
In our view, this judge's behavior cannot be deemed harmless. The case turned first on credibility. Before the jury could consider whether the Consumer Fraud Act had been violated, it had to determine if the statements, alleged to have been misleading, were actually made to plaintiffs by Krzyk and Ross. Plaintiffs said they were. Kryzk and Ross said they were not. The jury also had to determine which of the polar opposite experts' testimony to believe. There were even credibility questions on the issue of damages. If the jury found that Krzyk and Ross made misrepresentations about the Capitol windows' quality, it then had to determine whether plaintiffs suffered an ascertainable loss and, if so, what remedy was available. If it believed defendants' witnesses, it could have concluded that plaintiffs suffered no loss because they got what they paid for. On the other hand, if it found that plaintiffs had suffered a compensable loss, it had to choose between plaintiffs' experts, who claimed that total window replacement was the only remedy, and defendants' expert, who claimed to be able to fix plaintiffs' windows at a cost of between $30 and $200 per window.
Our reading of this record has persuaded us that, by the time this jury began to deliberate, the judge's trial conduct had deprived defendants of an honest chance in this pitched credibility battle.
Admittedly defense counsel made mistakes, and she probably could have better prepared her witnesses on some issues. In its best light, defendants' case was not a clear winner. It did not have to be to get to the jury. The question is whether the judge's conduct, apart from the merits of defendants' case, went over the line and whether his decision to ban sidebars in this case amounted to an abuse of discretion, see Priolo, supra, 321 N.J.Super. at 29, 728 A.2d 239, because it prejudiced defendants in the eyes of the jury. We think that it did, and, separate and apart from the question of whether this verdict could be sustained on this record, we cannot allow it to be upheld because, due to the conduct of the judge, we lack any certitude that the jury determined the case on its merits alone.
We recognize that this will burden the innocent plaintiffs with the rigors of a new trial. However, this judge's treatment of defense counsel cannot be countenanced if our system is to continue to view itself as one in which justice is the polestar. We thus reverse and remand this case for a new trial before a different trial judge. This ruling makes it unnecessary for us to address the remaining trial errors identified by the parties.

II
The only remaining issue is one raised on plaintiff's cross-appeal: whether the pretrial grant of summary judgment in favor of Weyerhaeuser was proper.[6]
The standard of appellate review of a grant of a motion for summary judgment, established in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 *592 (1995), is whether, viewing all of the competent evidential material presented to the trial judge in a light most favorable to the non-moving party, the evidence is so one-sided that a reasonable fact-finder must resolve the disputed issue of material fact in favor of the movant. Applying this standard, it seems to us that the motion judge improperly granted summary judgment in favor of Weyerhaeuser because of a misconception as to the doctrine of apparent authority.
The apparent authority doctrine has its origins in the law of agency, and is set out in the Restatement (Second) of Agency, § 267 (1958), which provides that
[o]ne who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by lack of care or skill of the one appearing to be a servant or other agent as if he were such.
While the doctrine generally presupposes the existence of a principal-agent relationship, such a relationship is not necessary to its application. Shadel v. Shell Oil Co., 195 N.J.Super. 311, 314, 478 A.2d 1262 (Law Div.1984). Apparent authority imposes liability on the principal not as a result of an actual contractual relationship, but because the principal's actions have misled a third-party into believing that a relationship of authority in fact exists. Blaisdell Lumber Co. v. Horton, 242 N.J.Super. 98, 102-03, 575 A.2d 1386 (App.Div.1990). Accord, Bahrle v. Exxon Corp., 279 N.J.Super. 5, 25, 652 A.2d 178 (App.Div.1995), aff'd, 145 N.J. 144, 678 A.2d 225 (1996). In such instances, the factual question which arises is whether "the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question." Mesce v. Automobile Ass'n, 8 N.J.Super. 130, 135, 73 A.2d 586 (App.Div. 1950).
It is the plaintiff's burden to establish the apparent authority and the agency relationship. Blaisdell Lumber, supra, 242 N.J.Super. at 103, 575 A.2d 1386; Hoddeson v. Koos Bros., 47 N.J.Super. 224, 231-32, 135 A.2d 702 (App.Div. 1957). More specifically, the plaintiff must establish, (1) that the appearance of authority has been created by the conduct of the alleged principal and it cannot be established "alone and solely by proof of [conduct by] the supposed agent," Blaisdell Lumber, supra, 242 N.J.Super. at 103, 575 A.2d 1386; Hoddeson, supra, 47 N.J.Super. at 232, 135 A.2d 702; (2) that a third party has relied on the agent's apparent authority to act for a principal, Sears Mortg. Corp. v. Rose, 134 N.J. 326, 338, 634 A.2d 74 (1993); Bahrle, supra, 279 N.J.Super. at 25, 652 A.2d 178; and (3) that the reliance was reasonable under the circumstances, Shadel, supra, 195 N.J.Super. at 316, 478 A.2d 1262.
Direct control by the principal over the putative agent is not absolutely necessary. Rather, a court must examine the totality of the circumstances to determine whether an agency relationship existed even in the absence of such direct control. Sears Mortg. Corp., supra, 134 N.J. at 338, 634 A.2d 74.
Here, during a pretrial motion, plaintiffs referred to their deposition testimony and that of Krzyk indicating that they were aware of Weyerhaeuser's financial backing of Scarborough. In granting the motion, the judge rested his decision solely on Weyerhaeuser's conduct. From his examination of the record, the judge found that the only conduct which was pertinent to the existence of apparent authority was that Weyerhaeuser lent its logo for use on Scarborough's letterhead. The judge found that fact to be insufficient to establish apparent authority. However, his decision was silent with respect to the element of reliance by plaintiffs *593 on that conduct. In our view, by omitting consideration of that evidence, the judge failed to properly evaluate all of the evidence before him and, consequently, came to the wrong conclusion on this motion for summary judgment.
The issue was whether Weyerhaeuser could be deemed liable to plaintiffs for the acts of Scarborough because Scarborough was acting as Weyerhaeuser's apparent agent. The disputed material fact was whether plaintiffs relied on Weyerhaeuser's conduct (lending Scarborough its name and logo for marketing purposes) in deciding whether to purchase these homes with Capitol windows.
All plaintiffs except the Murphys submitted identically worded certifications, which asserted that "the involvement of Weyerhaeuser was an important factor to me in making my purchase decision because I was aware of the Weyerhaeuser name as a large, prominent and successful building products company." In his deposition, Francis Murphy testified that one of the factors that went into his decision to select the Amberfield home was that the home "was being built by Scarborough, who had had that reputation, being backed by Weyerhaeuser, [so] we decided to buy that house." Furthermore, he knew Weyerhaeuser was a good company. Depositions of the remaining plaintiffs also suggested that they were influenced by and relied upon Weyerhaeuser's involvement with Scarborough in making their decision to purchase in a Scarborough development. James Fox asserted that he decided to purchase in Amberfield because "Scarborough was a well known name in the community. They were backed by Weyerhaeuser. Weyerhaeuser was a large corporation with a good reputation, so I anticipated having a quality-built home done." Every time he saw Scarborough's advertisement "Weyerhaeuser's name [and] logo [were] always with it." Fox also knew "of Weyerhaeuser being a large company on the New York Stock Exchange, [it] was well established ... a reputable building and lumber supply company," so it meant to him that he would not have the same difficulties he previously experienced with a builder he hired to build a home. He was also informed by Krzyk that Scarborough was a division of Weyerhaeuser, which meant to him that Weyerhaeuser was the parent company and Scarborough was a housing division.
Melissa Mercer stated that she knew the Weyerhaeuser name before purchasing her Amberfield home, and associated Weyerhaeuser with being a "stable, large company," which association influenced her decision to purchase her Amberfield house. The influence was substantial because "at the time there were othera lot of builders that were having a difficult time, and having the Weyerhaeuser name backing Scarborough meant to me that they weren't going to go belly up and we weren't going to have trouble having something fixed down the road." Over plaintiffs' counsels' objection, however, she responded shortly thereafter that she did not know whether she still would have bought the house in Amberfield had Weyerhaeuser not been associated with Scarborough: "I don't know whether it would have affected us buying the house." Thomas Guarino testified that the Weyerhaeuser name in the Scarborough "advertisements" influenced his decision to purchase his home.
Kryzk's deposition testimony substantiated that Scarborough was using Weyerhaeuser as part of its sales promotion, depicting it as the parent company associated with the builder. He acknowledged that he discussed the Weyerhaeuser affiliation with prospective homeowners to convey to them the integrity of the builder and its financial stability.
On the other hand, Delores Murphy and Sharon Guarino testified that they did not know anything about the Weyerhaeuser Company or its connection with Scarborough, and the use of the name meant nothing to them at the time they purchased their homes.
*594 There was no dispute that Weyerhaeuser authorized Scarborough to use its logo on Scarborough's business cards, brochures, press lists, correspondence and newspaper advertisements at the time that plaintiffs purchased their homes. However, as we have noted above, there was a serious factual dispute as to whether these plaintiffs placed any reliance upon the use by Scarborough of Weyerhaeuser's logo. At least some of plaintiffs asserted, under oath, that Weyerhaeuser's reputation as a large, stable company influenced their decision to buy in Amberfield. Whether this influence rose to the level of reliance, creating an apparent authority relationship between Scarborough and Weyerhaeuser, should have been decided by a jury. The motion judge should not have ignored that evidence in deciding whether summary judgment was appropriate. Certainly, Weyerhaeuser's permission to Scarborough to hold itself out as part of the Weyerhaeuser family of companies permitted plaintiffs to draw the very reasonable inference that Scarborough was a part of this large corporate structure, acting for its "parent" in marketing and building this development. With that perspective, the evidence is not so one-sided that a reasonable jury would have to resolve the issue in favor of Weyerhaeuser. We thus reverse the grant of summary judgment to Weyerhaeuser and remand the case to the trial judge for reinstatement of the complaint against Weyerhaeuser.
Reversed and remanded.
NOTES
[1] Endel Lindepuu and Ten Gir Corporation are the subcontractors who installed the subject windows in plaintiffs' homes. The third-party claims against Capitol were dismissed by the trial judge.
[2] The Brodeckis dealt with Tammy Ross, another salesperson, instead of Kryzk. She allegedly made the same representations as Kryzk.
[3] Thermal break occurs when a material that is either non-conductive, or less conductive, is used to join two pieces of a conductive material. With respect to aluminum, which readily transmits cold, a thermal break would be any kind of material which would join two pieces of aluminum so that the cold temperatures from one piece of aluminum would not conduct into the other pieces; whatever that less-conductive or non-conductive material would be, it would break the flow of cold or heat.
[4] This is a reference to our unreported opinion in Anaya v. Matera, A-1162-96T2 (App. Div. July 14, 1997), in which we reversed because this judge erroneously prohibited rebuttal testimony. The second section of the opinion was devoted to the plaintiffs' complaints about the judge's conduct and remarks which we found to have merit. We "disapprove[d] of any blanket rule or policy barring all sidebar conferences." Further, although the opinion does not delineate the "disparaging and inappropriate comments" regarding plaintiff and her counsel made by the judge we determined that some of the remarks "would have been better left unsaid" and, viewing the case in its entirety, that the judge "went over the line and his conduct should not be repeated."
[5] We note that the presence of the videotape gave us unusual insight into the interplay between the judge and defense counsel. For example, his tone, his facial expressions and his overall demeanor were revealed firsthand.
[6] Although plaintiffs' reference WRECO in the point heading which precedes their discussion of this issue, the text of the discussion makes absolutely no reference to that corporate entity. Indeed, the last sentence of this argument urges reversal of "the summary judgment in favor of Weyerhaeuser." Presumably plaintiffs have abandoned their claimed error with respect to WRECO's successful summary judgment motion. In any event, it is clear from the record that the motion judge correctly evaluated the evidence and properly concluded that there was nothing to send to the jury with respect to WRECO because nothing in the papers before him suggested that plaintiffs were even aware that WRECO existed at the time they made their purchase of these Scarborough homes.