# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1712-19

C.S.,

 Plaintiff-Respondent,

v.

J.L-S.[1],

 Defendant-Appellant.

_____

Submitted March 9, 2021 – Decided March 26, 2021

Before Judges Yannotti, Haas, and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FM-20-0386-14.

Law Offices of Lawrence W. Luttrell, attorneys for appellant (David W. Trombadore, of counsel and on the briefs).

DeTorres & DeGeorge, LLC, attorneys for respondent (Rosanne S. DeTorres, of counsel and on the brief).

---

[1]  We utilize initials to protect the confidentiality of the parties and their children.  R. 1:38-3(d)(3).

PER CURIAM

Defendant J.L.-S. appeals from an April 23, 2019 interlocutory order and a November 12, 2019 order entered following a plenary hearing adjudicating a custody and parenting time dispute with plaintiff C.S. We affirm.

The parties are fully familiar with the facts in this long-running post-judgment dispute involving plaintiff's efforts to have parenting time with the parties' three daughters, which we outlined in a prior decision. C.S. v. J.L.-S., No. A-2480-17 (App. Div. Mar. 29, 2019) (slip op. at 1-10). Our decision reversed a December 9, 2017 order, which reinstated plaintiff's parenting time pursuant to the parties' 2014 marital settlement agreement (MSA), based on a recommendation contained in a letter from the family therapist without making findings or affording defendant an opportunity to address the recommendation. Id. at 9-10. We remanded the matter to the trial court, stating:

> We appreciate the . . . judge's efforts to actively manage a difficult custody dispute without the necessity of successive, and undoubtedly costly, motion practice. However, the de jure suspension of plaintiff's parenting time for excess of a year, and de facto for a greater period, constituted a changed circumstance requiring the motion judge to make findings and explain the reasons for reverting to the MSA's parenting time schedule. Even if the judge believed he was enforcing the MSA pursuant to Rule 1:10-3 and 5:3-7(a), because he accepted the argument by plaintiff's counsel and the therapist's insinuation that

defendant's conduct had hampered parenting time, defendant had a right to be heard and the judge owed the parties an explanation of his decision. Without insight into the judge's thought process, we are unable to conclude there is sufficient evidence in the record to support the December 19, 2017 order.

> For these reasons, we reverse and remand the matter for the judge to render findings of fact and conclusions of law. The judge shall provide both parties the opportunity to be heard through certification and then determine whether a plenary hearing is necessary before adjudicating the custody and parenting time issues in dispute.

[Id. at 13-14.]

While the appeal was pending, the matter was re-assigned to the trial judge. In March 2018, plaintiff filed an order to show cause to enforce the December 2017 order, which had not been stayed, and defendant filed a motion for a stay pending the appeal. The judge denied both requests. Thereafter, in accordance with orders entered by the prior judge, the trial judge ordered reunification therapy with Dr. David Diament of Diament Psych Associates, QTS, LLC in October 2018. Our decision was released on March 29, 2019.

On April 19, 2019, Dr. Diament issued a report containing clinical observations and therapeutic recommendations based upon eighteen therapeutic sessions with the family individually and together, review of a multitude of post-

A-1712-19

judgment orders, a 2017 forensic psychologist's best interests evaluation, and other materials.

Dr. Diament found each party blamed the other for plaintiff's estrangement from the children. He explained the eldest child suffered the most because she "was much more aware of the conflict(s) between [plaintiff] and [defendant]." Dr. Diament concluded he was "not certain about [the middle child's] clinical status because thus[]far, she continues to be relatively uncommunicative with respect to her feelings other than to say she feels 'uncomfortable' and cries when in [plaintiff's] presence." Dr. Diament concluded the middle child was "emotionally overwhelmed with the intensity of the acrimony in her family and is withdrawing from it as much as she is able." He found the youngest child was

> most amenable to a relationship with [plaintiff,] but is conflicted with loyalty issues relative to her mother and sisters. She has in all probability been privy to railings about [plaintiff] and I'm certain this has significantly impacted on her perceptions and reactions to him as well as to her anxiety.

Dr. Diament concluded as follows:

> I believe that reunification is in the best emotional interest of the children and that both parents must do better at putting aside their estrangement from each other and rather, put the children's best interest first.

4

They both contributed to all of this happening and now they will have to both contributed to the resolution.

He recommended plaintiff "work on becoming less defensive and more open to self-reflection about possible contributions he may have made to the current estrangement rather than attributing the problems predominantly to others." He recommended defendant

extend herself more than just superficially complying with the letter of [the court's orders] . . . [and] show the children that she feels just as strongly as . . . [plaintiff] about facilitating . . . reunification with their father and be open to more self-reflection with respect to how she . . . contributed to the estrangement.

Dr. Diament recommended reunification therapy continue, and the eldest child receive therapy "to focus on her own emotional issues and conflicts" and have parenting time with plaintiff separate from her sisters. He also recommended the parties consider therapy for the younger children with a mutually agreed upon therapist who "agrees to communicate with both parents and understand[s] that treatment efforts should be coordinated with the reunification therapist."

On April 23, 2019, the trial judge entered an order accompanied by a written statement of reasons, scheduling a plenary hearing and reinstating plaintiff's parenting time under the December 2017 order pending the hearing.

A-1712-19

Citing our decision, the judge noted we "made no determination as to whether the [December 2017 order] was or was not in the children's best interests[,]" and our decision was predicated on the lack of due process afforded defendant and "an insufficient record" to enable our review of the order. The judge stated: "Just days prior to the decision of the [A]ppellate [Division], both parties through counsel asked that the court seek an update from [Dr. Diament] about the progress of the [reunification therapy] process. The appellate decision came before that update could be acquired."

The judge described what followed in explaining his ruling:

> This court, upon receipt of the appellate decision, scheduled a telephonic case management conference, which took place on April 9, 2019. That conference was conducted by the court in chambers and off the record. While the purpose of the conference was simply to discuss scheduling, counsel for [p]laintiff informed the court that [d]efendant had allegedly reacted summarily to the appellate decision by denying [p]laintiff parenting time with the children. The court indicated that it would await review of Dr. Diament's report, which was requested to be expedited under the circumstances, before addressing parenting time.
>
> Dr. Diament issued his report dated April 17, 2019, and it was received by the court on April 22, 2019. It has been released to the parties under a protective order. It can fairly be said that the reunification therapy has been moving along slowly and with great difficulty, according to the report. The children, to varying degrees, have not been willing to

6

embrace the process. Most importantly, Dr. Diament concludes as follows: "It will be extremely challenging to make significant therapeutic progress towards reunification given the level of acrimony, the completely divergent parental narratives of history and of accountability and the limitations on any significant parenting time role for [plaintiff.] It will become even more challenging to make any progress if the children are provided with any opportunities or options (additional opportunities if [plaintiff] is accurate) to spend less time with their father than they do now." . . .

Against this backdrop, the court has concluded that the parties are entitled to a plenary hearing as to the best interests of the children going forward. In the interim, it is important to note that [the December 2017] decision has not been found by the Appellate Division to be plainly incorrect, or not in the best interests of the children. Moreover, it has now been the status quo for [seventeen] months. Dr. Diament's report makes clear that an interruption in this parenting time will frustrate reunification therapy. Thus, it is the decision of this court that the parenting time as ordered [in the December 2017 order] shall continue pending the plenary hearing ordered by this court.

The plenary hearing occurred over the course of four days in September 2019. Plaintiff sought custody of the children and defendant sought the continued suspension of his parenting time. Each party testified and plaintiff called his stepdaughter, wife, and two former court-appointed reunification therapists, Phoebe Jeffrey and Roy Hirschfeld, as his witnesses.

A-1712-19

Plaintiff's first witness was defendant. She testified plaintiff was "extremely aggressive" and she could not recall any "happy times" with plaintiff and the children during the marriage. She claimed she left the children in plaintiff's care "very little" because he was a "bad father." Even though she alleged there was domestic violence during the marriage, she acknowledged she never reported it to the Division of Child Protection and Permanency (the Division), and conceded she told a counselor there was no domestic violence. Defendant testified the eldest child claimed plaintiff sexually abused her, but the Division concluded the claim was unfounded.[2]

Defendant claimed she tried to abide by the MSA provisions[3] requiring her to foster a positive relationship between the children and plaintiff and

---

[2] Defendant's testimony on her case in chief similarly outlined her allegations of domestic violence and child abuse. She also alleged plaintiff was not an involved father during the marriage.

[3] The MSA contained the following provisions: "Both parties will always encourage the love of the children for both parents. The custodial parent will promote the relationship of the children with the non custodial parent." Additionally, the MSA contained an addendum entitled "Guidelines for the parents A-Z" which stated:

. . . .

(c) It is expressly understood by both parties that neither shall do anything to alienate the children's

encouraged the children to go with plaintiff for parenting time, but they were "hysterical." Defendant testified on one occasion the eldest child called her asking to be picked up from plaintiff's home during his parenting time, and defendant told her she could not get her, but she did not tell her plaintiff loved her or that he would not hurt her. Although defendant claimed she had the ability to cooperate with plaintiff, she could not provide any objective evidence of doing so.

---

affection for the other or color the children's attitude toward the other.

. . . .

(e) The parties will encourage a good feeling from the children about the other parent and his/her family relatives.

. . . .

(g) The parties will communicate with each other openly and honestly, and regularly to avoid misunderstanding[s] which are harmful to the children.

. . . .

(y) Neither [p]arent shall do anything that shall estrange the children from the other [p]arent, nor to impair the natural development of a child's love and respect for the other [p]arent.

9

Plaintiff's counsel confronted defendant with numerous emails in which plaintiff attempted to communicate with her regarding the children to which defendant did not respond. Defendant conceded she did "not [comply with] all of" the court ordered parenting time exchanges claiming the children would not go and instead would "scream[], hid[e], [and] lock[ the car] doors." However, defendant could not explain what frightened the children and admitted she did not compel them to go with plaintiff. This was corroborated by four audio recordings of the parenting time exchanges played for the court, showing defendant exerted little to no effort to encourage the children to enjoy parenting time and involved the eldest child in the parties' disputes.

Plaintiff's adult step-daughter testified she had known him for seven years and described him as "pretty much like my dad." She testified he taught her to drive, went to all her school functions, and took her on all her college visits. She described him as "always loving" and respectful of her mother. She described the parties' children as quiet and explained when they were in plaintiff's home, they remained in their room with the door shut unless they "grab stuff from the pantry and then go back up to the room."

Jeffrey testified her goal as a reunification therapist was to "enmesh" the family, so "the children and their father and mother [could] all work[] together

as a family unit in a custody agreement . . . [and that] in order to do that all parties must have custody so [they] can work out the problems within that custody agreement or within parent and child relationships." She testified it was not unusual for the children to remain in their room during visits with their father because they were unfamiliar with the home. She stated the children "were worried about their father yelling" and defendant worried about plaintiff's "anger."

She explained although plaintiff expressed anger during the therapy sessions, she understood his anger given the circumstances of not seeing his children for years. She concluded "there[ was] manipulation at play" because the children refused to eat at plaintiff's house and defendant would pack snacks for them. She testified she stopped working with the family after defendant told her plaintiff "had inappropriate sexual contact" with the eldest child because the Division became involved and the family "needed a higher level of care."

Hirschfeld testified he served as the reunification therapist in 2016. He testified when he met with defendant, she told him "she did not want to participate in this process and . . . [plaintiff] was an angry and aggressive man[,] she felt that there had been a lot of abuse, and she didn't want her children to be subjected to this." He stated defendant was "ambivalent on scheduling" her and

her children's appointments.  At one point, he told defendant, "I want you to say right in front of the kids . . . that you want them to see their dad and come to therapy, and she wouldn't do that."

Hirschfeld testified that during plaintiff's sessions with the children, plaintiff "was very emotional.  He cried with them and he said he loves them. He wants to get to know them and he talked a lot with [the middle and youngest child] about their childhood and the past and all the good times."  With the eldest child, plaintiff "was always . . . conciliatory, [and] supportive . . . .  He was never critical or . . . attacked her."  He noted even though the eldest child stated she hated plaintiff "she really hadn't seen him that often.  So my assumption . . . was somebody's got to be explaining these type of things to [her]."

Hirschfeld explained why he withdrew from the case in the following colloquy:

> [Hirschfeld:  I]n my office there's a big lobby.  There's a lot of people sitting there, and I . . . can recall to this day that the kids were standing out in the bathroom in the hallway crying, saying they didn't want to come in to see me.  And then I went to look why aren't they coming in, and I absolutely recall [defendant] saying to me ["]are you looking at my children in the bathroom? Why are you looking at them?["] Because the door to the women's room was open.
>
> So I took a step back.  I walked back into the lobby.  There was such commotion that there were staff

and people saying . . . ["]you can't have this. There's . . . there's too much crying and emotion being presented.["] And so it created a situation that I guess I felt professionally that . . . clearly it would be difficult for me to proceed because if the only thing that's being represented is crying and the constant refrain ["]I don't want to be here, I don't want to be here,["] and [defendant] did nothing, in my opinion, to try to encourage the girls to come in. As a matter of fact, in the hallway near the bathroom she was hugging them and holding them. And I understood that as a loving, supporting mom that's reasonable, but I said to her, . . . ["]can you have them come in?["] And they said they didn't want to come in. . . .

[Plaintiff's Counsel:] Did [defendant] respond to them when they said they didn't want to come in?

[Hirschfeld:] She just continued to hug them. She didn't say anything.

[Plaintiff's Counsel:] Why did you withdraw from helping this family?

[Hirschfeld:] Because I saw it turning into a very, very difficult situation, and I felt, . . . in terms of expertise[,] that beyond my role as a family therapist that there needed to be a forensic evaluation to see . . . what are the underlying clinical issues going on for all of the parties involved. And what are the impediments? So I felt the next step, because . . . family therapy wasn't going anywhere, wasn't effective[, I recommended] to do a forensic evaluation with a clinician . . . .

He concluded defendant

and the children felt that they were being forced to come to a therapeutic setting. [The children] had a view

of their father that they didn't want to be with him. They didn't want to see him. And it was my impression that [defendant] represented to the children that this is not a positive environment for them and that they don't really have to be here.

Despite the children's lack of interaction with plaintiff and his family when they visited his home, Hirschfeld recommended "maintain[ing] parenting time unless there is some evidence of physical abuse, and you try to then co-jointly add counseling or other clinical services." He noted the children never alleged any incidents of abuse during his sessions with them.

Plaintiff's wife testified he was an involved parent in her children's lives and described him as "exceptional[,] loving[, and] attentive." She testified her children went to elementary school with the parties' children. She described plaintiff's unsuccessful attempts to bring the children home for parenting time and stated he was "upset about it[, but said] he's never going to stop going." She also described the first time the children came for parenting time after it was reinstated as follows:

> I can remember I was working late. I actually had to travel to New York, and [plaintiff] went to pick them up. And I got home about [seven] o'clock, and it was December. And the three girls were sitting on the porch with no jackets on. [Plaintiff] was on the front porch, and I was shocked, you know, like what's going on? And naturally they were upset and crying. They all had their hoods on over their face. And I kind of just was

14

like ["]come on guys, why don't you come inside? Let's have dinner. I don't want you stay out here in the cold.["] Nobody responded to me. Not one.

My kids were inside the house, . . . and I can remember them being upset as well because I can remember them saying to me they didn't know why. Was it us? Or how can I kind of help? And I can remember [my son who] hasn't seen [plaintiff's youngest child] . . . , and they were classmates[,] in a long time, so he was kind of excited about that. And he was bringing her out some toys or something he wanted to show her to try to make them feel comfortable to come in.

. . . I can remember [plaintiff] saying to them, . . . ["]guys, let's go inside and you can go in your room. I don't want you sitting out here in the cold.["]

I sat down on the porch next to them, and they were shivering, and I said, ["]you know, I really want you guys to come inside. And I know this is very tough for you guys, and I just want you to know that [d]addy loves you and I love you and we're all happy that you're here.["] But it was very emotional. And then they wouldn't go inside. . . . I asked them all to come inside and eventually he just took them. They left. . . . They went home.

Plaintiff's wife described how on one occasion her daughter convinced plaintiff's eldest child to come to the kitchen. When the child removed her headphones and they started conversing, "it was like the heavens opened. Smiling, laughing, looking over at [plaintiff], talking. And then, again, it was like all of the sudden she remembered where she was, put her ear buds back in,

15

and . . . went back in her room." She described other visits during which the children did not eat, and during one weekend the children "did not come out at all. Not to shower. Not to brush their teeth. Not to eat. Anything." She testified when plaintiff called the children on FaceTime, they would answer but the screen would be "a ceiling, a wall, . . . nothing."

Plaintiff testified that he was "a loud guy," but denied any domestic violence or child abuse. He also acknowledged he yelled to discipline the children, but he would not "get in a two-foot high kid's face," as defendant alleged. He testified defendant disciplined the children by "[p]ulling by the hair, cursing . . . ." He stated that during the marriage, he spent time with the children alone without defendant, took them on errands, brought them to family's houses, coached their games, went on field trips, attended school functions, and played with them at home.

Following the divorce and sale of the marital home in 2015, defendant moved over forty miles away with the children and transferred their schools without discussing it with plaintiff. He testified he could not coordinate therapy for the eldest child because of defendant's refusal to communicate with him.

Plaintiff testified the children came to the parenting time exchanges, but refused to leave with him twenty times, and "thirty consecutive times after that

there were no shows." Once parenting time was reinstated, defendant either failed to encourage the children to attend, or interfered with his time by packing food so they would not have to eat with him. He testified he could not see the children for their birthdays and holidays.

He testified when he had individual parenting time with the middle child, she was "[s]miles," and talkative, "like old times," and always kissed him goodbye. When she visited him with the other children, it was a "[t]otal one-eighty." Plaintiff described his relationship with the children as follows: "There's no relationship. . . . [T]hey get in the car, they come, but there's no relationship. There's no interaction, there's no daddy, hi, bye, love you, hug, kiss. They don't even look at me. They barely look at me." He testified he sought custody because the children were not safe in defendant's care. He elaborated on this issue during his testimony addressing the N.J.S.A. 9:2-4(c) factors as follows:

> [Plaintiff's Counsel:] Factor number five. The safety of . . . the children.
>
> [Plaintiff:] I don't believe . . . they're safe now.
>
> [Plaintiff's Counsel:] Why is that?
>
> [Plaintiff:] Because this isn't . . . safe what they're going through. It's not normal. Not that . . .

17

everything's . . . totally normal, but this is nowhere near a little bit normal . . . . [T]hey're in distress right now.

[Plaintiff's Counsel:] How does you having custody alleviate that stress?

. . . .

[Plaintiff:] Well, my story all along is what's happening is . . . there'll be no alienation, the alienation will stop.

On November 12, 2019, the trial judge issued a written decision recounting the history of the matter. He noted even though the parties were divorced in October 2014, the parenting time provisions did not become effective until the marital residence was sold, and the parties began residing separately in June 2015. The judge recited his predecessor's handling of "a series of court applications, and attempts at therapeutic intervention" beginning in February 2016, which resulted in an order suspending parenting time in June 2016, the appointment of the reunification therapist and a forensic psychologist to conduct a best interests evaluation, culminating in the December 2017 order.

The judge credited Jeffrey's testimony that reunification was not working. He found her testimony was corroborated because since the December 2017 order "the children have steadfastly refused to engage with [plaintiff] or their step-family." The judge found defendant "facilitated this behavior by packing food for" the children during their visits to plaintiff's residence. The judge also

recounted Dr. Diament's findings and recommendations. He credited the testimony of plaintiff's wife and stepdaughter.

The judge interviewed the children individually and made the following findings. The youngest child

> stated that she doesn't talk to her father. When she is with him she either stays in the car [on the midweek night] visits or in the bedroom at her father's house. She doesn't know why she doesn't like to talk to him. . . . She says that she has bad memories at her [d]ad's place, but couldn't identify any of them, except for one time when [d]ad [threw] a phone out of the house. She says it used to upset her because her parents would argue so much.
>
> . . . [T]he middle child . . . states that[] when she's at [d]ad's house she doesn't even eat. She is offered food but doesn't come out of the room. She doesn't like her father[] because he "doesn't really seem like a dad." She alleges that he used to start fights, but can't recall them. She acknowledged that she used to talk to her father before the divorce. . . . Like [her younger sibling,] she recounts that her parents fought a lot during the marriage.
>
> . . . [The eldest child] professes to be happy living with mom, and likes spending time with her.
>
> Conversely, she does not have a good relationship with her father. She says she "never felt good with him", that he never helped her when she had problems and always acted like he was the boss. When reminded that her father used to coach all of her sports teams[,] she replied that he always acted like a coach, as opposed to a father. She recalled the . . . incident,

19

where she had thrown her phone into a pillow and he reacted by throwing it outside and screaming at her. She also recounted that her parents fought a lot. She also says she dislikes his new wife, because she escalates things, recounting that she once yelled at [her] for not talking to her father. [L]ike her sisters, [she] did not feel that family therapy was helpful.

The judge found both parties "made poor witnesses," but for markedly different reasons. He found plaintiff, "who is a large and imposing figure, was unable to keep his cool on the stand . . . feeling that the system had failed him . . . feeding into [defendant's] narrative." Conversely, the judge found defendant

is simply an incredible witness, and one this court finds gave false testimony in numerous instances. She testified her attorney "forced" her to sign the parenting agreement, which is simply incredible. She admitted she signed it without intention to live up to it. She blames [plaintiff's] anger and behavior as the genesis for the girls' antithesis towards their father. The problem with this is that all three girls represented they remember both of their parents arguing. In addition, her portrayal of him stands in direct contrast to his current wife and step-daughter, who portray him as a kind and loving man. The court found their testimony to be genuinely offered, and credible. Defendant testified [plaintiff] was always a poor father, a representation that is contradicted by the many photos of the girls' early years, and the unrebutted testimony that he coached their teams and was a chaperone on school trips. . . . She claims it is "impossible" to parent with . . . [p]laintiff. All of the evidence shows that she has never even tried. She has rarely if ever asked him to participate in a decision regarding the children and he usually only learned afterwards what decisions she

20

made without him. Perhaps the biggest lie is that she testified that she has encouraged the girls' relationship with their father. Nothing could be further from the truth. She has done nothing to encourage the girls, as could easily be heard on the tapes of the pickups. While there is no evidence that she set out to alienate the children, there is every indication that she has been only too happy to facilitate the estrangement from their father that they clearly feel. Finally, on the stand she conducted herself just as Dr. Diament described. When confronted she professes ignorance or confusion, which given her behavior can only be an act.

The judge assessed each N.J.S.A. 9:2-4(c) factor and found they preponderated in plaintiff's favor on the issue of parenting time. He found defendant was unwilling to communicate with plaintiff in matters regarding the children and "hasn't lifted a finger to facilitate the relationship between [p]laintiff and his daughters[.]" Addressing the statutory factor regarding the children's preference, the judge stated:

> If the court gave any stock in the children's preferences, their relationship with their father would be over. The court has carefully listened to and considered the opinions of the girls. However, the two youngest cannot even so much as articulate a reason why they don't want to see their father. The court has listened to [the eldest child] and doesn't discount for a second that she generally believes the grievances she has with her father. Having said that, they are simply not true, at least to a large degree[.]

A-1712-19

Addressing the statutory factor regarding the children's needs, the judge found both parties capable of providing for the children's material needs, but

> question[ed] whether [defendant] can provide the emotional needs of the children that will allow them to live happy and complete lives. Children benefit from having both of their parents in their lives, assuming the parents are fit. In her animus towards [plaintiff] and her willingness to facilitate their misplaced enmity towards him, she has harmed the children by helping to deny them a full relationship with their father[.]

To that end, in assessing the parental fitness factor, the judge found "[t]here is no question of the fitness of [p]laintiff. The court's concerns as to the fitness of [d]efendant are in relation to her willingness to assist the children to not have a meaningful relationship with their father[.]" The judge further found the statutory factor regarding the ages of the children favored plaintiff because "[t]he children were eleven, nine and six when the parties divorced. Five years ha[ve] been lost since then. They are sixteen, fourteen and eleven now."

The judge concluded the December 2017 order was "exactly correct" and reinstated parenting time. He ordered parenting time with the younger children occur separate from the oldest child, who would have individual parenting time. The judge ordered the children to spend their time with plaintiff "and not sequester themselves in the bedroom without his permission [and w]hile they are with him for weeknight and weekend visitation, they are barred from any

22

contact with their mother whatsoever." The judge awarded plaintiff four weeks of summer parenting time with the older child at plaintiff's discretion and the entire summer with the younger children "with the exception of the week school ends and the week before school recommences."

The judge concluded as follows:

> Most importantly, and let this be perfectly clear, [d]efendant will do absolutely everything in her power to effect the terms and purpose of the order. She will actively and on a daily basis encourage her daughters to build their relationship with their father. She will not make a single decision of substance regarding their lives without consulting and reaching [an] agreement with [plaintiff]. She will ensure that he is aware of every event in their lives, and that he is included in same. . . . If this order is not followed by her, this court can and will reconsider its decision as to a full change of custody.

On appeal, defendant argues the judge erred reinstating parenting time pending the hearing because our decision was the law of the case. She argues the decision to reinstate parenting time following the hearing was also in error because the judge did not consider the children's preferences. Defendant asserts the judge erred in revising parenting time and granting plaintiff the entire summer without explanation and his decision is "unsubstantiated."

Our scope of review of a trial court's findings of fact is "limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). Trial court rulings are "binding on appeal

when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). Because the court "hears the case, sees and observes the witness, [and] hears them testify," it is better positioned to evaluate the credibility of witnesses. Id. at 412 (alterations in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). Family Part judges "possess special expertise in the field of domestic relations." Ibid. As a result, "the opinion of the trial judge in child custody matters is given great weight on appeal." Terry v. Terry, 270 N.J. Super. 105, 118 (App. Div. 1994) (citing Palermo v. Palermo, 164 N.J. Super. 492, 498 (App. Div. 1978)). Therefore, we intervene "[o]nly when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark'" to "ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). We review all legal conclusions de novo. Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017).

We reject defendant's assertion the trial judge could not reinstate parenting time or that our prior decision was law of the case. We have stated:

> "Under the law-of-the-case doctrine, 'where there is an unreversed decision of a question of law or fact made during the course of litigation, such decision settles that question for all subsequent stages of the suit[,]'" Bahrle

24

v. Exxon Corp., 279 N.J. Super. 5, 21 (App. Div. 1995) (quoting Slowinski v. Valley Nat'l Bank, 264 N.J. Super. 172, 179 (App. Div. 1993)), aff'd, 145 N.J. 144 (1996), and the determination "should be respected by all other lower or equal courts during the pendency of that case." Lanzet v. Greenberg, 126 N.J. 168, 192 (1991) (citing State v. Reldan, 100 N.J. 187, 203 (1985)). The doctrine is a non-binding rule intended "to prevent relitigation of a previously resolved issue." In re Est. of Stockdale, 196 N.J. 275, 311 (2008).

[Jacoby v. Jacoby, 427 N.J. Super. 109, 117 (App. Div. 2012) (alterations in original).]

Our decision remanding the matter neither expressly nor implicitly restrained the trial judge from reinstating parenting time pending the hearing. Therefore, the law of the case doctrine was inapplicable because we did not decide whether it was appropriate to reinstate parenting time. Indeed, our difficulty with the December 2017 order is that it lacked any findings or semblance of having afforded the opposing party due process. The trial judge corrected the prior judge's error when he explained why he was reinstating parenting time in the written findings accompanying the April 2019 order.

Moreover, Family Part judges have the authority to enter temporary custody determinations pending a final decision. See N.J.S.A. 9:2-3 stating: "Until the court determines the final custody of the minor child and unless the parties agree otherwise, the court shall determine temporary custody based upon

A-1712-19

the best interests of the child with due regard to the caretaking arrangement that previously existed." See also N.J.S.A. 2A:34-23 (stating "after judgment of divorce . . . the court may make such order as to the . . . care [and] custody . . . of the children . . . as the circumstances of the parties and the nature of the case shall render fit, reasonable and just . . . ."). Therefore, the reinstatement of parenting time pending the hearing was well within the judge's power to grant.

Defendant's argument that the judge did not consider the children's preferences lacks merit. As we recounted, the judge not only interviewed the children and recited their preferences for custody, he also explained in detail why their preference not to see plaintiff could not be honored. Furthermore, the children's preference is one of thirteen statutory factors the judge had to consider under N.J.S.A. 9:2-4(c). The record supported the judge's decision to not give the children's preferences determinative weight because it furthered their estrangement from plaintiff and was contrary to their best interests.

Defendant also argues the judge "conflated" statutory factors one and ten by finding her unable to communicate under factor one and finding her unfit "on the same basis." She asserts the judge could have found her unfit only if her "conduct ha[d] a substantial adverse effect on the child," and he did not make such a finding. She also argues because the judge found she could provide for

the material children's needs, provided a stable home, had appropriate employment, and the children were bonded with her, she could not be unfit. We disagree.

The judge's finding that defendant was unfit was because she hampered the children's relationship with plaintiff. The record supports this finding because defendant's conduct clearly had a substantial adverse effect on the children, as evidenced by their non-existent relationship with plaintiff and the absence of evidence of a valid reason for the discord.

Finally, we reject defendant's argument the revised parenting time schedule the judge ordered was unsubstantiated. The substantial credible evidence supported separating the parenting time of the younger children from their older sister because her relationship was the most estranged and difficult to remediate due to her age and the passage of time.

The record also supported the decision to grant plaintiff nearly the entire summer with the younger children and the provisions barring them from sequestering themselves or contacting defendant during parenting time. Indeed, the substantial credible evidence showed that plaintiff's best chance at salvaging the father-daughter relationship is through uninterrupted face-to-face time with

27

the children.  It is evident the revised parenting time schedule aimed to achieve that goal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1712-19